**EMMPRESA CUBANA DEL TABACO, d.b.a. Cubatabaco, Plaintiff,**

v.

**CULBRO CORPORATION and General Cigar Co., Inc., Defendants.**

**No. 97 CIV. 8399(RWS).**

United States District Court, S.D. New York.

June 26, 2002.

al Cigar Co. Inc. (collectively "General Cigar") have moved pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment to dismiss the complaint of plaintiff Emmpresa Cubana del Tabaco d.b.a. Cubatabaco ("Cubatabaco") on the basis of estoppel, acquiescence, and laches due to Cubatabaco's alleged long delay in challenging General Cigar's use and registrations of the COHIBA trademark. Cubatabaco has moved (1) to strike General Cigar's affirmative defenses of estoppel, acquiescence, and laches; and (2) for partial summary judgment on its claims of abandonment and under Articles 7 and 8 of the General Inter–American Convention for Trademark and Commercial Protection ("IAC" or "Inter–American Convention"), Article 6bis of the Paris Convention for the Protection of Industrial Property ("Paris Convention"), New York common law, and the Trademark Dilution Act.

For the following reasons, these motions are denied in part and granted in part.

*Parties*

Cubatabaco is a company organized under the laws of Cuba with its principal place of business in Havana, Cuba. Directly, and through its licensee, Habanos, S.A., Cubatabaco exports tobacco products from Cuba throughout the world, excluding the United States because of the current trade embargo. It was established by the Cuban government as an independent entity with its own assets and administration and is subject to the jurisdiction of a Cuban ministry.

Culbro has been merged into and is survived by General Cigar Holdings, Inc. General Cigar Holdings is a Delaware corporation with its principal place of business in the county of New York and functions as a holding company for General Cigar Co. Inc.

Rabinowitz, Boudin, Standard, Krinsky & Lieberman by Michael Krinsky, David B. Goldstein, New York City, Winston & Strawn by Kevin Walsh, Steve Young, New York City, for Plaintiff.

Latham & Watkins by John J. Kirby, Jr., Marcellus Williamson, Elena C. Norman, New York City, for Defendants.

## OPINION

SWEET, District Judge.

Defendants General Cigar Holdings, Inc. (the legal successor in interest to named defendant Culbro Corporation) and Gener-

General Cigar Co. is a Delaware corporation with its principal place of business in Bloomfield, Connecticut. General Cigar Co. is in the business of manufacturing, marketing, advertising and distributing tobacco.

General Cigar and its predecessors in interest have been major U.S. manufacturers and distributors of cigars for more than a century.

### Prior Proceedings

Cubatabaco filed its complaint on November 12, 1997, alleging that Cubatabaco possessed a COHIBA mark for its cigars that was "well-known" in the United States at the relevant time, and that General Cigar's efforts to exploit and trade upon Cubatabaco's COHIBA mark in order to generate profits on the sale of its own cigars entitled Cubatabaco to relief under the Paris Convention, Arts. 6bis and 10bis; the Inter–American Convention, Arts. 7, 8, 20 and 21; section 43(a) of the Lanham Act, 15 U.S.C. §§ 1125(c)(1) and 1125(a); and New York State law.

On December 11, 1997, the parties in settlement discussions entered into a written agreement that, *inter alia,* (1) the actions of both parties in this court and in the U.S. Patent and Trademark Office ("PTO") are "stopped"; (2) "the time spent during the negotiation will not be used by any of the parties to the detriment of the other, in case there is no [settlement] agreement;" and (3) "use of General Cigar's COHIBA trademark as from the signing of this Contract will not be used in detriment of Cubatabaco if agreement is not reached." The parties reported this agreement to the Court on December 16, 1997, and, at their request, all proceedings

were stayed, including discovery, until litigation was renewed in February 2000.

By order dated December 5, 2000, Counts V (Article 22 of TRIPS), VI (Article 10 of the Paris Convention), VIII (false representation of origin in violation of Section 43(a) of the Lanham Act) and IX (deceptive advertising in violation of Section 43(a) of the Lanham Act) were dismissed with prejudice in light of the decision in *Havana Club Holding S.A. v. Galleon S.A.,* 203 F.3d 116, 124 (2d Cir. 2000).

General Cigar filed the instant motion for summary judgment on the basis of its equitable defenses on November 29, 2001. On January 29, 2002, Cubatabaco filed its motions for summary judgment to dismiss General Cigar's equitable defenses and for summary judgment on its claims under Articles 7 and 8 of the IAC; Article 6bis of the Paris Convention; the Federal Trademark Dilution Act; and New York common law. The motions were heard on March 13, 2002, and were considered fully submitted at that time.

### Facts

The following facts are taken from the parties' Rule 56.1 statements [1] and, as required, are construed in the light most favorable to the non-movant, as applicable. They do not constitute findings of fact by the Court.

### I. The Cuban COHIBA

In 1969, Cubatabaco filed an application to register the "COHIBA" mark in Cuba. By 1970, cigars branded with Cubatabaco's COHIBA trademark were being produced at the El Laguito factory in Havana. The

---

**1.** General Cigar submitted one Rule 56.1 Statement and responses to Cubatabaco's two Rule 56.1 Statements; Cubatabaco submitted two Rule 56.1 Statements and one response to General Cigar's Rule 56.1 statement. The statements have been compiled due to the similarities in facts alleged and the interrelationship of the three motions to which they relate.

cigar box and band bore a distinctive design developed for the COHIBA cigar as well as the COHIBA trademark. The registration issued on May 31, 1972.

Throughout the 1970's, Cuban COHIBA cigars were commercially available and sold in Cuba at Havana's main hotels, upscale restaurants and two retail outlets. From 1970 to 1975, Cubatabaco claims that annual sales at the two retail outlets in Havana averaged approximately 100,000 cigars and increased to approximately 180,000 cigars per year by 1975. In addition, since at least 1970, COHIBA cigars had been sold to the Cuban Council of State, which includes the office of the Cuban President and to another Cuban state enterprise which in turn sold the cigars to Cuban Ministries and other government institutions.[2] Cubatabaco claims that the total volume of sales grew from approximately 350,000 to 375,000 per year from 1970 to 1975 to approximately 550,000 to 600,000 per year from 1975 to 1980. There are no records of these sales, however, as Cubatabaco has a policy of destroying its sales and production records after five years.

On November 15, 1977, *Forbes* magazine published an article on the impact of Cuban cigars on the U.S. industry that noted that Cubatabaco was developing a Cohiba cigar. General Cigar's principal executives read this article.

By January 1978, Cubatabaco had made application to register COHIBA in 17 countries, including most of the Western European countries.[3] The applied-for registrations issued in due course. Cubataba-

co did not, however, sell COHIBA cigars outside of Cuba until 1982.

On February 6, 1978, a *New York* magazine article featured Cubatabaco and COHIBA cigars. In the article, Cubatabaco commented that it would be commercially possible for Cubatabaco to sell cigars in the United States successfully under new brands if, as it appeared to be the case, it would not be able to sell under the historic trademarks it preferred as a result of the *Menendez* litigation, which is described *infra* in Part III. Cubatabaco stated, "We have the unassailable trademark ... the one which says 'Havana' or 'Made in Cuba,' and that is the only one we need."

The *Miami Herald's* Sunday magazine, *Tropic*, also reported on the COHIBA cigar on March 19, 1978.

In July 1981, Cubatabaco announced that it would soon begin commercial exports of COHIBA in *Cubatabaco International* (July–December 1981), published in English for the foreign cigar trade. The COHIBA cigar was on the issue's front cover. In this publication, Cubatabaco expressly positioned COHIBA as the pinnacle of Cuban cigars.

In January 1982, The Spanish trade publication, *Actualidad Tabguera* reported that Cuba would soon begin international sales of the "famous cigar Cohiba." In June 1982, *El Pais*, a general circulation paper, reported on the imminent arrival of COHIBA in Spain.

On June 30, 1982, Cubatabaco launched COHIBA's international commercial sales at an event in Madrid during the World Cup.

---

**2.** General Cigar contests the characterization that cigars obtained and given away by Fidel Castro, other governmental officials and entities were sales by Cubatabaco.

**3.** The countries were: Great Britain, Ireland, Belgium, the Netherlands, Luxembourg,

Spain, France, Denmark, Portugal, Australia, Egypt, South Africa, Argentina, Mexico, Switzerland, Venezuela, Colombia, and Italy. Cubatabaco has by now registered the mark in more than 115 countries total.

In 1983, Cubatabaco sought to register the COHIBA mark in the United States for the first time. In August 1984, its United States attorneys (Lackenbach, Siegal, Marzullo, Pesa & Aronson ("Lackenbach")) informed Cubatabaco that General Cigar had already obtained the registration on February 17, 1981.

On February 22, 1985, Cubatabaco filed an application with the PTO to register in the United States the BEHIQUE mark with the same trade dress it used on COHIBA cigars.[4]

In 1987, Cubatabaco sought and obtained an opinion from Lackenbach on whether to begin legal proceedings over the COHIBA registration. Thereafter, Cubatabaco learned that General Cigar had filed a Declaration of Use and Incontestability for its COHIBA registration under Sections 8 and 15 of the Lanham Act in 1986 in connection with its 1981 registration for COHIBA. Cubatabaco chose not to take any action against General Cigar.

In a November 1992 interview with Padron, published in the Spring 1993 *Cigar Aficionado*, Francisco Padron, director of Cubatabaco, replied to a question regarding the company's future strategy for Cuban cigars. The magazine included the following purported exchange:

> CA: Many American smokers don't realize that there are two brands of Partagas, a Partagas in America from the Dominican Republic and a Partagas sold around the world from Cuba. Assuming that tomorrow the embargo was lifted, how would it work?

> Padron: We are not going to have two brands over there. Not even in Europe. We decided to break off our deal with Davidoff because of that. So what would happen is that we would launch new things for the North American market, new brands. Or we could make an arrangement with the brand owners there.

> CA: General Cigar, as an example, owns the brand names Partagas, Ramon Allones and Cohiba for the U.S. market, and it has tremendous distribution in the United States. I would imagine that they would love to sit down with you and work it out to represent those brands of Cuban cigars in America. Is this possible or a problem? You are shaking your head no.

> Padron: The first condition is that they must pass the brand name to us. This is the first condition Immediately. If not, forget about it. Second condition, they must be our partner the same way that we have it with the rest of the world. There is no other way to make a deal with us. If not, forget about it.

Padron also stated:

> We want to have [a] Habano cigar, not a brand name. It doesn't matter if it is Bolivar, Montecristo or even Cohiba. For the last four years, we have been telling the connoisseur how to recognize a Havana. When we launched the smoke ad we just put Havana, no Habanos. We think the most important thing is the umbrella that can cover all brand names. We can create a brand name whenever we want.

4. In July 1988, Cubatabaco filed an application in the United States to protect an updated version of the same trade dress in conjunction with the word BEHIKE. In 1996, Cubatabaco filed an application in the United States to protect another version of its trade dress by filing an application to register solely the trade dress. Cubatabaco registered the COHIBA trade dress in conjunction with BEHIQUE or other marks to protect the COHIBA trade dress in countries where other parties had previously registered the COHIBA mark.

Cubatabaco challenges these statements as unreliable given the difficulties of translation (the interviewer spoke no Spanish) and complexity of legal issues. In response, General Cigar notes that Padron never corrected or disclaimed the statements attributed to him in the interviews.

## II. *General Cigar's 1981 Registration*

General Cigar first learned of the name "COHIBA" in the late 1970's. General Cigar executives had read the *Forbes* article discussed above. In addition, a December 1977 internal memorandum refers to COHIBA as "sold in Cuba/brand in Cuba" and "Castro's brand cigars."[5]

In February 1978, General Cigar employee Oscar Boruchin ("Boruchin") discussed the COHIBA brand with Edgar Cullman Jr. ("Cullman"), chairman of Culbro. Boruchin purportedly had learned of COHIBA from a friend who visited Cuba on behalf of the State Department during the Carter Administration and was given COHIBA cigars in Cuba by "the highest echelons of government."

On March 13, 1978, General Cigar filed an application to register "Cohiba," with a claimed first use date of on or before February 13, 1978. Before or after pursuing this application, General Cigar did not request counsel to conduct a trademark search in Cuba or internationally, which would have disclosed the Cuban registrations. There is evidence to suggest that such a search would not have been industry practice in these circumstances.[6]

It is a disputed issue as to whether the COHIBA name was well-known at this time. Boruchin testified that he told Cullman that "[n]obody knew the brand," and it was "not on the market," "didn't mean anything to anybody," and was "just given to visitors, diplomats." Cubatabaco states, however, COHIBA cigars were well-known in the United States cigar industry and among the public because of the two magazine articles mentioning COHIBA. Further, numerous United States journalists, business executives, and others knew of the brand from seeing it on sale in retail outlets and hotels in Havana, from receiving it as gifts in Cuba and at receptions in the United States, and by word of mouth.

On July 25, 1978, the U.S. Patent and Trademark Office ("PTO") asked General Cigar "whether the term COHIBA has any meaning or significance in the relevant trade or industry." General Cigar answered in the negative.

On March 20, 1979, the PTO, in another Office Action, noted, "Cohiba is a geographical tobacco growing region of Cuba," and stated that the COHIBA application would be refused as either geographically descriptive or misdescriptive, depending on whether the goods were from Cohiba. In a September 14, 1979 response, General Cigar asserted that COHIBA was "wholly arbitrary" and "fanciful and arbitrary," which Cubatabaco claims General Cigar clearly knew to be false.

On November 4, 1980, General Cigar's COHIBA application was published in the

---

**5.** The words came from handwritten notations on an internal memoranda, and the handwriting was never identified. General Cigar claims that this writing cannot establish that it knew that Cubatabaco was using the COHIBA mark or selling COHIBA cigars prior to General Cigar's first use or application to register the COHIBA mark.

**6.** While other U.S. law firms could and did conduct international trademark searches at

the time, General Cigar cites the testimony of a U.S. trademark lawyer retained by Cubatabaco who stated that he has never conducted a trademark search in Cuba for a party who did not intend to use or register the mark in Cuba. Moreover, he stated that he generally does not conduct any foreign trademark searches for clients who want to use the mark in the United States only.

Trademark Office Official Gazette for opposition purposes. Neither Cubatabaco nor any other entity opposed General Cigar's COHIBA application. General Cigar obtained United States registration for the COHIBA mark, Registration 1,147,309, on February 17, 1981.[7]

### III. *The Growth of Parallel Brands as a Result of the Cuban Revolution and Cuban Embargo*

General Cigar alleges that COHIBA represents another example of a "parallel brand" that resulted from the Cuban Revolution and the subsequent embargo.

On January 1, 1959, Fidel Castro seized control of the Cuban government. The new government seized privately-owned cigar manufacturers on September 15, 1960. Some of the ousted Cuban cigar owners reestablished their businesses abroad using the trademarks their families had owned before the government seizure.

In 1963, the U.S. government imposed an embargo on trade with Cuba, prohibiting anyone subject to the jurisdiction of the U.S. from transporting, importing or otherwise dealing in or engaging in any transaction with respect to merchandise "of Cuban origin." 31 C.F.R. §§ 515.101 *et seq.* (1999) (the "Embargo").

Although the embargo prevented Cuban entities such as Cubatabaco from selling cigars and other Cuban products in the United States, it did not prevent them from registering or protecting trademarks, trade dress and other intellectual property in the United States. In fact, Cubatabaco has aggressively protected its intellectual property in the United States.[8]

In a series of cases in the 1960's and early 1970's (the "*Menendez* litigation"), U.S. courts upheld rights of the former owners of Cuban cigar trademarks in the United States against claims of the Cuban government and governmental entities. The courts determined that the owners of the expropriated Cuban cigar companies retained ownership of the pre-expropriation common law trademark rights obtained by their pre-expropriation sale of cigars in the United States under those trademarks and the appurtenant good will. The courts so ruled on the ground that the United States would not give extraterritorial effect to takings without compensation and hence would not give legal effect to the Cuban expropriations of the cigar companies as applied to trademark registrations and common law rights existing in the United States at that time. *F. Palicio y Compania, S.A. v. Brush & Bloch*, 256 F.Supp. 481 (S.D.N.Y.1966), *aff'd* 375 F.2d 1011 (2d Cir.1967); *Menendez v. Faber, Coe & Gregg*, 345 F.Supp. 527 (S.D.N.Y. 1972), *aff'd in part and rev'd in part sub nom. Menendez v. Saks & Co.*, 485 F.2d 1355 (2d Cir.1973), *cert. granted as to certain questions*, 416 U.S. 981, 94 S.Ct. 2382, 40 L.Ed.2d 758 (May 13, 1974); *reargued* Jan. 19, 1975; *rev'd in part and cert. controverted in part sub. nom. Alfred Dunhill of London v. Republic of Cuba*, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976).

Over time, U.S. cigar manufacturers, including General Cigar, purchased some of

---

7. Whether the trademark was legitimately obtained is a matter of dispute. Cubatabaco claims that General Cigar's incomplete, misleading and false responses to the PTO's queries were certain to mislead the PTO from a full and proper consideration of the matter, including that the Cuban brand was protected from registration or use in the United States under the Inter–American Convention.

8. Cubatabaco employed lawyers in the United States, filed U.S. trademark applications and arranged for specific investigations into filings in the U.S. Patent and Trademark Office. It also protected its trademarks around the world. In the 1990's, it had 8,000 registrations worldwide. It has registered COHIBA in approximately 115 countries.

the U.S. trademark registrations and rights from the families who fled Cuba. As a result of the upholding of the ousted Cuban owners' U.S. trademark rights, "parallel brands" developed, *i.e.*, the Cuban government sells a Cuban cigar in Cuba and other parts of the world under the same apparent trademark as an unrelated company that sells a non-Cuban cigar in the U.S. It is not the same trademark, however, as the U.S. cigars are sold under trademarks which the owners had registered and used in the United States for the sale of their cigars prior to the expropriation of the Cuban cigar companies.

COHIBA's situation is different from those of the brands in the *Menendez* litigation, as the COHIBA brand was not originally a privately owned company prior to the Revolution and embargo, nor was it sold in the United States prior to that time. COHIBA therefore did not involve an expropriated owner seeking to use its U.S. trademark while the Cuban government continued to use the Cuban and other trademarks. It is true, however, that the Cuban COHIBA is sold around the world and in Cuba, while cigars under the same apparent mark are sold in the United States by a different, unrelated entity.

### IV. *Sales of General Cigar's COHIBA–Branded Cigars From 1978 to 1997*

From 1978 to 1997, General Cigar sold three different pre-existing cigars—the White Owl, the Canario D'Oro, and the Temple Hall—as a "COHIBA cigar" by placing a COHIBA label on the cigars.

#### A. *1978–1982: COHIBA–Branded "White Owl" Cigars*

Beginning in 1978, General Cigar shipped 1,000 or fewer COHIBA-branded cigars per year.[9] The cigars were White Owl "stock" machine-made cigars that were shipped along with other White Owl cigars (or other "seconds") labeled with as many as 32 other different brands as part of a "trademark maintenance program."

The cigars were irregularly and sporadically shipped to two retailers who, by pre-arrangement, were given a full credit back on the nominal payment they made to General Cigar. Two boxes of 50 cigars of each of the 33 brands were simultaneously shipped in identical cardboard boxes, with stick-on labels affixed to two boxes for each of the 33 different brands. These shipments were not sent out when "seconds" were not available.

The cardboard boxes with the different labels, including "COHIBA," were sold in the same cartons they were in with a sign stating the price per box. If the two boxes with the COHIBA label were at the bottom of the box, they would not have been visible to the consumer.

General Cigar sold the following amounts of COHIBA-branded White Owl cigars during this period:

| | |
|---|---|
| 1978: | 650 |
| 1979: | 600 |
| 1980: | 1,000 |
| 1981: | 700 |
| 1982: | 200 (single shipment on April 15, 1982) |

#### B. *1982–1987: COHIBA–Branded "Canario D'Oro" Cigar*

Beginning in November 1982, General Cigar placed the COHIBA brand on its

---

9. This figure is based on the invoices still in existence twenty years after the periodic shipments were made. General Cigar claims that more shipments were likely made, but the records thereof have not been located. General Cigar has not posited estimates of what it believes constitute the actual figures.

pre-existing Canario D'Oro premium cigar. The COHIBA-branded Canario D'Oro was packaged in a clear plastic canister with a price between that of a high-end premium cigar and a "bundled" cigar. General Cigar's sole promotion of the brand consisted of in-store advertising materials.

On June 23, 1986, General Cigar filed a sworn "Declaration Under Sections 8 and 15 of the Trademark Act of 1946" for its COHIBA registration, in which it attached a "specimen showing the mark as currently used" (the packaging in which the Canario D'Oro was sold as of November 1982). As part of the requirement to establish incontestability under Section 15, General Cigar declared that "the mark shown therein has been in continuous use in interstate commerce for five consecutive years from February 17, 1981 to the present."

On November 3, 1986, the PTO granted "incontestability status" to General Cigar's COHIBA mark.

Sales of the COHIBA-branded Canario D'Oro ceased sometime in 1987.

General Cigar sold the following amounts of COHIBA-branded Canario D'Oro cigars during this period:

1982: 90,000 (Nov. and Dec. only)

1983: 323,000

1984: 118,000

1985: 70,000

1986: 5,000

1987: 3,000 [10]

10. Cubatabaco disputes that figure but accepts it for purposes of the summary judgment motion.

11. General Cigar claims that COHIBA cigars nonetheless stayed on store shelves and were

### C. *Period of No Sales from 1987 to 1992*

General Cigar itself [11] made no sales under the COHIBA name for at least five years, from sometime in 1987 until November 20, 1992.

It is disputed whether during this time period General Cigar abandoned its earlier registration of COHIBA or merely stopped selling a lower-quality version in order to make plans for a higher priced, "super-premium" [12] version.

General Cigar claims that it decided to convert COHIBA from a "bundled" cigar into a premium cigar that would be sold in wooden boxes and used as one of General Cigar's principal brands, and that it stopped shipping the non-premium cigars from 1986 to 1992 to develop the premium brand of COHIBA. Cubatabaco alleges, however, that General Cigar did not begin working with an outside consultant to develop the premium COHIBA until September 1992, six years later.

It is undisputed that the following events occurred during this time period.

In April 1989, General Cigar sought to use the word mark "COHIBA" in conjunction with the identical copying of the Cuban COHIBA trade dress. Counsel advised in July 1989 that the trade dress was already registered, and based on this legal advice, General Cigar determined not to use the identical trade dress.

On November 9, 1990, General Cigar sent a cease and desist letter, asserting that the use of the name "COHOBA" for cigars infringed on General Cigar's "considerable rights in [its 1981 COHIBA] registration."

sold during that time due to the shelf-life of cigars and the depressed cigar market of the late 1980's and early 1990's.

12. "Super-premium" is a pricing range.

In December 1991, General Cigar again considered using an element of the Cuban COHIBA trade dress, the so-called "Indian Head" design. Outside counsel advised against it, and in-house counsel informed the marketing department that "We are out of luck on the use of the Indian Head design." The outside counsel in April 1989 and December 1991, advised General Cigar that either non-use or mere token use of a mark was insufficient to sustain rights and would constitute abandonment.

### D. *1992–1997: The COHIBA–Branded "Temple Hall" Cigar*

On September 1, 1992, the premiere issue of *Cigar Aficionado* was published, with a distribution of 115,000 copies [13] and display at 453 cigar outlets. The premier issue was introduced to the trade on August 27, 1992, at a breakfast held by *Cigar Aficionado* at the annual convention of the Retailer Tobacco Dealers of America ("RTDA"), the principal retailers' association. Complimentary copies of the premier issue were distributed to the 300 to 400 attendees.

The issue featured the Cuban COHIBA in a six-page cover story about "Cuba's Best Cigar," entitled "The legend of Cohiba: Cigar Lovers Everywhere Dream of Cuba's Finest Cigar." [14] On September 21, 1992, *Newsweek* ran an article on *Cigar Aficionado's* launch, noting that COHIBA was the initial winner of the magazine's first "blind tastings" feature, and that the

first issue had featured ads for premium products such as Glenlivet single-malt scotch, Louis Vuitton luggage "and, of course, COHIBA cigars." [15] Cubatabaco claims that General Cigar decided in the fall of 1992 to sell a new product under the COHIBA name "to somehow capitalize on the success of the Cuban brand and especially at this point in time the good ratings that it got, the notoriety that it got from *Cigar Aficionado*." General Cigar states that it had always intended to resume use of the COHIBA mark.

In September 1992, defendants began to work with an outside graphic designer, Cliff Bachner ("Bachner") on the trade dress of the new COHIBA. John Rano, General Cigar's head of marketing, instructed Bachner to make "exactly same" copies of the Cuban COHIBA trade dress. Bachner did as instructed, but General Cigar states that it never used those prototypes in commerce.[16] Milstein, who was Assistant General Counsel for General Cigar at that time, testified in deposition that General Cigar wanted to use a label as near as possible to the Cuban COHIBA "for the same reason they wanted to use it in '89 and again in '91," that is "they wanted to somehow capitalize on the success of the Cuban brand, and especially at this point in time the good ratings that it got, the notoriety that it got from *Cigar Aficionado*." Milstein Dep. at 284.

---

**13.** That number is equal to 25% of all premium cigar smokers. The magazine was the first to be aimed at premium cigar smokers.

**14.** The article called the Cuban COHIBA, "perhaps the world's finest smoke," and "legendary to most cigar aficionados." In its rating of cigars, the magazine gave COHIBA Robusto and Esplendido scores of 96 and 98 out of a possible 100. The premier issue made other positive references to the Cuban COHIBA.

**15.** Prior to 1992, COHIBA was referenced 46 times in articles dating from as early as 1977 and stretching over the fifteen-year period.

**16.** Cubatabaco claims, however, that General Cigar utilized the same typeface as it and placed the mark in the same location on the cigar box (the lower right hand corner), beginning in November 1992. It claims that General Cigar did this in order to better exploit the Cuban COHIBA's name and to suggest strongly that the product was a variety of, and affiliated with, the Cuban COHIBA.

In the first week of November 1992, Ron Milstein, General Cigar's then Assistant General Counsel ("Milstein"), and Alfons Mayer, General Cigar's Vice President for Tobacco ("Mayer"), traveled to Havana, Cuba, at the invitation of Cubatabaco to attend an international conference in Havana for the 500th anniversary of the European discovery of tobacco, which included the launch of a new line of COHIBA cigars, "Siglo (Century) 1492." In a private meeting, Mayer informed Padron of General Cigar's interest in entering into a broad and exclusive partnership with Cubatabaco for the United States territory upon the embargo's end, which would replicate the 51/49 partnership for distribution of Cuban cigars that Cubatabaco had created in the rest of the world. COHIBA was not mentioned during the meeting. Milstein wrote of the meeting:

> We met with Mr. Padron for 1 hour over breakfast. The talk was of the Consolidated sale rumor. We got no more information. Mr. Padron made it very clear that trademarks are not important. He said Havana will sell cigars no matter what name they have. Any companies that have marks (this was directed to G.C.) would have to sell (give) the marks back to Cubatabaco and get distributorship rights only, or else Cubatabaco will sell the cigars under a new name.

While at the conference, Milstein was introduced to Adargelio Garrido, a Cubatabaco attorney ("Garrido"). Milstein did

not speak Spanish and Garrido, a native Spanish speaker, had not studied English at the time. General Cigar claims that a conversation took place between the two men. The evidence of this meeting is a memorandum Milstein wrote two weeks after the meeting.[17] Milstein wrote that Garrido "acknowledged that we owned the name in the U.S. and that we would be free to sell a cigar under that name there." Milstein's memorandum also indicated that Garrido stated that Cubatabaco would object to any use General Cigar made of the trade dress associated with Cubatabaco's COHIBA cigars. Cubatabaco raises several objections to this evidence.[18]

In November 1992, General Cigar began to sell a COHIBA cigar again by relabeling its pre-existing "Temple Hall" cigar. This COHIBA was a medium-priced cigar. General Cigar made no reference to its earlier "COHIBA" product, and the trade dress was completely different. The cigars were sold only at Alfred Dunhill of London, an upscale retailer ("Dunhill"), and Mike's Cigars, a Florida retailer, wholesaler, and mail-order distributor. In 1992, General Cigar sold through Dunhill only. General Cigar engaged in no advertising or promotion of the COHIBA-branded Temple Hall cigar from 1992 to 1997.

Prior to this time, General Cigar knew of the Cuban COHIBA's sale, use, registration and employment in Cuba.

In the fall of 1992, General Cigar requested that its outside counsel provide a

---

**17.** Milstein and Mayer both also testified in depositions as to the meeting and that Garrido indicated that General Cigar owned the COHIBA word mark in the United States.

**18.** First, it claims that the memorandum is inadmissible hearsay because Milstein has no independent recollection of the event and did not write the memorandum until two weeks after the alleged conversation took place. It also disputes that the conversation could have even or ever did take place. Garrido, a native

Spanish speaker, testified that he "did not have a conversation, it was just an introduction." Further, Mayer testified that Milstein met with a Cubatabaco lawyer while walking down a corridor at the conference center, while Milstein testified that he thought he met Garrido at the Cohiba Siglo launch party. Finally, Cubatabaco also states that Garrido had not, and could not be reasonably viewed as having, the authority or apparent authority to make the statements attributable to him.

legal opinion regarding its rights to the COHIBA name and use of the Cuban CO-HIBA trade dress. On December 2, 1992, Morgan & Finnegan advised General Cigar that Cubatabaco's registrations of the trade dress would probably not support an action by Cubatabaco against General Cigar for use of its trade dress. Instead, it warned that use of the Cubatabaco trade dress could increase the potential for Cubatabaco's being able to show likelihood of confusion regarding the COHIBA mark based upon its "prior existing reputation for the Cuban COHIBA mark." Further, use of the trade dress "would lend support to an argument that General Cigar was acting in bad faith, i.e. with an intention to mislead the public into confusing General Cigar's product with Cubatabaco's" and could expose General Cigar to liability. Morgan & Finnegan advised General Cigar to obtain Cubatabaco's written confirmation of General Cigar's right to use the COHIBA word mark and that it would be prudent not to launch the product even without the trade dress elements of Cubatabaco's product before obtaining that confirmation. It also advised General Cigar to file a new U.S. trademark application coinciding with the new launch of the CO-HIBA product. This new registration "would not be vulnerable to any claims of earlier abandonment [19] which may be asserted against the existing registration."

On December 30, 1992, General Cigar filed an application to register COHIBA, purportedly to protect the appearance of the mark in bold, capital letters. Cubatabaco claims that General Cigar filed the application because it had abandoned its 1981 registration.

In a January 13, 1993 memo to the top executives of General Cigar, the assistant general counsel Milstein laid out General Cigar's strategy "to exploit the popularity, familiarity, brand recognition and overall success of the Cuban Cohiba." Milstein also stated General Cigar's desire to use "the familiar trade dress of the Cuban Cohiba."

In the spring of 1993, General Cigar's advertising agency developed a campaign for the new, premium COHIBA. They first phase of the "strategy" was to "[e]xploit the Cohiba name, with its reputation as one of the world's finest cigars amongst cigar smokers, to build a brand image for the U.S. Product." [20] In mid–1993, General Cigar instructed the advertising agency to stop working on the COHIBA campaign, and no more work was done until March 1997.

Also in the spring of 1993, General Cigar's graphic designer developed trade dress designs similar, but not identical, to the Cuban trade dress, based on instructions for "further exploration," "in terms of color, typography and graphics," of the "original [Fall 1992] comps" which "came from the Cuban Cohiba." These plans, too, were put on hold from mid–1993 until March 1997. During the time period from mid–1993 to March 1997, General Cigar claims that it was in the process of developing the blend to use in the "super-premium" COHIBA. Cubatabaco contests this, stating that General Cigar's practice was to develop blends and then name them. [21]

19. General Cigar states that counsel who prepared this opinion was unaware that General Cigar had sold hundreds of thousands of CO-HIBAs during the 1980's.

20. General Cigar contests this to the extent it suggests that General Cigar sought to exploit the fame of the COHIBA *mark*.

21. It claims that the product given the COHI-BA name was developed as part of a process of simultaneously developing and naming several different blends, and that General Cigar was always in the process of developing new and better cigars. General Cigar claims that it also selected brand names and then developed blends for use with the brand names,

In a December 1993 interview with Padron, which appeared in the Spring 1994 edition of *Cigar Aficionado,* the following exchange purportedly took place:

CA: If the embargo ended tomorrow or two to five years from now, have you thought through how it would happen and what the scenario would be? You have problems with certain brands as far as trademark issues, and with other brands you do not have a problem. Have you thought how you would introduce your brands to the American market?

Pedron: First there is going to be a fight. We have not been able to have the brand name in the United States because of the embargo. It was forced by [the United States]. It was not decided on our side.... But we are not going to fight in order to get our cigars into the United States. As we always say, a Habano [cigar] is a Habano [cigar]. With a name of Marvin or Padron or Meyer or whatever goes on the cigar, it is a Habano. So, we are going to let everybody know that we are here, and this is a Habano. We are not going to fight with somebody else because he owns the brand name of Cohiba or Montecristo in America. We have been living without that for a long time.

Cubatabaco objects to this statement for the same reasons it objects to Padron's earlier interview excerpts.

In January 1994, Cubatabaco received a box of General Cigar's COHIBA-branded Temple Hall cigars. Along with the box, Cubatabaco received a note stating that

the box was not sold as a "regular item" and that it was being produced by General Cigar only for purposes of its trademark registration.[22] At the time Cubatabaco believed that General Cigar was not making stable or continuous use of the COHIBA trademark in the United States. Cubatabaco's counsel did not learn of the box until some time later.

On April 12, 1994, General Cigar's application to register COHIBA in a block letter format was published for opposition. No entity challenged General Cigar's application to register COHIBA in block letter format at that time.

On June 2, 1994, Cubatabaco first learned of General Cigar's application to register COHIBA in block-letter format after the time to file an opposition had expired. Sometime after that, Cubatabaco engaged and communicated with its United States attorneys (plaintiff's counsel Rabinowitz, Boudin, Standard, Krinsky & Lieberman ("Rabinowitz, Boudin")) with respect to contesting General Cigar's rights to the COHIBA mark.[23]

The Autumn 1994 issue of *Cigar Aficionado* quoted Cullman as stating that General Cigar (1) was "sitting on" its COHIBA rights with "no big plans at the moment," despite, in the interviewer's words, the fact that COHIBA "is widely regarded as the No. 1 brand produced in Cuba"; and (2) would "like to work something out with" Cuba regarding COHIBA when the embargo was lifted.

In 1995, the PTO granted General Cigar's application to register the COHIBA mark.

and that COHIBA is an example of where it did that.

**22.** The note read in full: "This Box of Cohiba is produced by General Cigar for trademark registration purposes in the U.S.A. only. This is not to be sold as a regular item. That is why you only see the name Cohiba. The

cigar is ___ Tom." The back of the box bore a stamp, "Dunhill by Alfred Dunhill of London, Inc. Handmade in Santiago Republica Dominicana 42K Beverly Hills."

**23.** Cubatabaco claims that it dropped the matter after the interview with Cullman, discussed below, was published.

In the September 1996 issue of *Cigar Aficionado*, Cullman announced that General Cigar "had a plan to come out with Cohiba" "within the next two years."

Cubatabaco had decided in the summer of 1996 to commence proceedings against General Cigar and on November 19, 1996, Garrido instructed Rabinowitz, Boudin to do so.

General Cigar sold the following amounts of the COHIBA-branded Temple Hall cigars, constituting less than 0.05% of General Cigar's annual premium cigar sales, from 1992 to 1996:

1992: 5,600 (November and December only)

1993: 50,000

1994: 49,000

1995: 101,000

1996: 96,000

## V. *Cubatabaco Submits Cancellation Petition*

On January 15, 1997, Cubatabaco applied to register the COHIBA mark and filed a Petition for Cancellation with the PTO. On May 28, 1997, Cullman contacted Francisco Linares, president of Habanos, S.A., a marketing arm of Cubatabaco, to propose a settlement meeting. As noted earlier, the instant lawsuit was filed on November 12, 1998.

General Cigar claims that it has been prejudiced because Cubatabaco waited until 1997 to file this petition.

First, it claims it had taken a number of actions to protect its rights in the COHIBA mark. Cubatabaco alleges that the bulk occurred after Cubatabaco filed its cancellation petition in January 1997. General Cigar:

- filed two lawsuits for infringement of General Cigar's COHIBA trademark, both of which resulted favorably for General Cigar. *General Cigar Co. v. G.D.M. Inc.*, 988 F.Supp. 647 (S.D.N.Y.1997); Case No. 98 Civ. 8174 (S.D.N.Y.).[24]

- assisted the Customs service to prevent importation of counterfeit COHIBAs;[25] communicated with importers of detained or seized goods.

- participated in one action before the PTO to prevent the registration of a mark, "CAOBA," similar to its COHIBA registration.[26]

- obtained or supported actions by criminal law enforcement authorities against sellers of unauthorized COHIBA cigars and related products.

- hired private investigators to investigate infringers and their activities, to submit related affidavits in support of search and seizure warrants and to review seized merchandise and related records bearing the COHIBA mark, all at General Cigar's expense.

- sent at least two[27] "cease and desist" letters to infringing users of the COHIBA trademark.

- spent $1.5 million in enforcement activities.

General Cigar also alleges that it has been prejudiced by Cubatabaco's delay in bringing this suit because witnesses have died or are elderly and ill and unable to testify. These witnesses are:

---

24. The lawsuits were filed after January 1997.

25. General Cigar presents as evidence five letters; four are dated after January 1997.

26. The action took place in 1997.

27. It claims to have sent "numerous" of such letters, but the evidence presented reveals only two such letters. One was dated after Cubatabaco filed the cancellation petition.

- Frank Fina, Sr., a General Cigar employee for 45 years and Vice President of Manufacturing, has died;
- John McLoughlin, a Sales Administrator at General Cigar's corporate offices, is hospitalized and cannot testify in this action;
- Gregory Atkinson, an attorney at Morgan & Finnegan who worked on the COHIBA matter for General Cigar, has died;
- James Siegel, the attorney who filed the U.S. BEHIQUE registration on behalf of Cubatabaco, has died;
- Henry Whitehall, Vice President and Secretary of Culbro Corporation from 1946 until 1987, who signed the 1978 registration and the Section 8 and 15 declaration, has died;
- Robert Lilienfield, a former Vice President of General Cigar until 1998 and who was in charge of premium cigars, is ill and cannot testify in this action;
- Nicholas Freeman, a go-between between General Cigar and Cubatabaco with regard to their respective trade rights in the COHIBA trade dress, has died;
- Amy Lineberger, Manager of Marketing Research at General Cigar from November 1996 until June 1998, has died.

According to Cubatabaco, General Cigar has not been prejudiced by the unavailability of these witnesses because General Cigar failed to identify the materiality of their testimony and failed to specify in many instances that the witnesses were unable for deposition after Cubatabaco filed the cancellation petition. Further, General Cigar has deposed more than 35 other persons, and Cubatabaco contends that they are more central to this matter than those witnesses identified by General Cigar.[28]

In addition, General Cigar claims that it has been prejudiced as many witnesses do not recall the events in question because they took place so many years ago. Cubatabaco argues, however, that General Cigar has failed to identify any material factual question affected by loss of memory.

General Cigar also notes that all files related to Cubatabaco maintained by Lackenbach Siegel were destroyed in a flood caused by Hurricane Floyd in 1999.

## VI. *General Cigar Introduces Super-Premium COHIBA*

In August 1997, General Cigar introduced the super-premium COHIBA cigar at the RTDA Convention. No sales were made to the public at this time.

In September 1997, General Cigar launched its new product with an "unprecedented" advertising and promotional campaign costing more than $2 million. The product was promoted nationwide through broad channels of premium retail trade. Cubatabaco claims that the product launched in September 1997 intentionally adopted a trade dress "as near as possible" to the Cuban COHIBA and that it is confusingly similar.

*Cigar Aficionado* and its affiliated publication, *Cigar Insider*, rate cigars. They typically give ratings of 90 or better to a few select brands in each category of cigars. The super-premium General Cigar COHIBA has received a 90 rating or better, but has not received it consistently.

The following sales of the super-premium COHIBA occurred:

28. General Cigar has deposed twenty-nine of its own present and former employees, including CEOs, Presidents, heads of marketing and sales, the trademark custodian, two in-house and four outside attorneys, numerous personnel directly involved in the 1982, 1992, and 1997 launches, and the graphic designer.

1997: 509,000 (August to December only)

1998: 858,000

1999: 985,000

The following summarizes the approximate annual sales of the various versions of the COHIBA-branded cigars:

**White Owl**

1978: 650

1979: 600

1980: 1,000

1981: 700

1982: 200 (single shipment on
 April 15, 1982)

**Canario D'Oro**

1982: 90,000

1983: 323,000

1984: 118,000

1985: 70,000

1986: 5,000

1987: 3,000 [29]

1988: 0

1989: 0

1990: 0

1991: 0

**Temple Hall**

1992: 5,600 (Nov. and Dec. only)

1993: 50,000

1994: 49,000

1995: 101,000

1996: 96,000

**Original COHIBA blend**

1997: 509,000 (Aug. to Dec. only)

1998: 858,000

1999: 985,000

## DISCUSSION

### I. *Jurisdiction*

This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338(a), and 15 U.S.C. § 1121(a) for claims arising out of alleged violations of Sections 38, 43(a) and (c), and 44(b) and (h) of the Lanham Act, 15 U.S.C. §§ 1120, 1125(a) and (c) and 1126(b) and (h).

### II. *Venue*

Venue is appropriate in this district under 28 U.S.C. § 1391.

### III. *Standard for Summary Judgment*

Rule 56(e) of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits ... show that there is no genuine issue as to material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Silver v. City Univ.*, 947 F.2d 1021, 1022 (2d Cir.1991). "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61 (2d Cir. 1995). In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct.

---

**29.** As discussed earlier, Cubatabaco disputes the figure.

1348, 89 L.Ed.2d 538 (1986); *Gibbs–Alfano v. Burton,* 281 F.3d 12, 18 (2d Cir.2002).

## IV. *Abandonment*

As part of its Count XI, Cubatabaco seeks the cancellation of General Cigar's 1981 COHIBA registration because of alleged abandonment. Cubatabaco has moved for summary judgment on this claim based on General Cigar's inaction from 1987 to 1992.

It is necessary to determine whether abandonment has occurred at the outset as this determination may affect the analysis of whether General Cigar's equitable defenses apply. Whether acquiescence, estoppel, and laches result from the period between 1984 and 1997 presents a much different question than whether they apply to the period between 1992 and 1997.

## A. *Equitable Defenses Do Not Apply to Claims of Abandonment*

■ As an initial matter, General Cigar's equitable defenses do not apply to

Cubatabaco's claims that the 1981 registration was abandoned.[30]

There is no question that in actions before the PTO, equitable defenses such as the ones General Cigar asserts here are unavailing against cancellation claims based on abandonment. The only question is whether that rule also applies when the cancellation proceeding is brought before a court.

The Lanham Act provides that a petition to cancel a trademark registration may be filed "at any time" if, *inter alia,* the registered mark has been abandoned. 15 U.S.C. § 1064(3)[31]. Based on the "at any time" language,[32] the PTO's Trademark Trial and Appeal Board has ruled in cancellation hearings that equitable defenses are not available against claims of abandonment in cancellation of trademark registration cases. *Treadwell's Drifters Inc. v. Marshak,* 1990 WL 354600, 18 U.S.P.Q.2d 1318, 1320 (Trademark Tr. & App. Bd.1990) ("[E]quitable defenses are not available against the claims of abandonment ... because it is in the public

---

**30.** For the same reasons discussed herein, nor can they apply to Cubatabaco's claims that the 1981 registration and 1986 incontestability declaration were obtained fraudulently. These fraud claims are not addressed because of the determination, *infra,* that the mark was abandoned between 1987 and 1992.

**31.** That provision states, in pertinent part:

A petition to cancel a registration of a mark, stating the grounds relied upon, may, upon payment of the prescribed fee, be filed as follows by any person who believes that he is or will be damaged ... :

(3)

At any time if the registered mark becomes the generic name for the goods or services, or a portion therefore, ... or has been abandoned, or its registration was obtained fraudulently or contrary to the provisions of section 4 [15 U.S.C. § 1054] or of subsection (a), (b), or (c) or section 2 [15 U.S.C. § 1052] ... or contrary to similar

prohibitory provisions of such prior Acts ... or if the registered mark is being used by or with the permission of the registrant so as to misrepresent the source of the goods or services on or in connection with which the mark is used.

15 U.S.C. § 1064.

**32.** Two other subsections provide a narrow five-year window for filing a cancellation petition. § 1064(1) and (2). The "at any time" language is therefore a significant difference and suggests the legislative intent to provide a limitless opportunity to challenge registrations based on the provisions of § 1064(3).

Further, the fact that § 1069 permits the application of the equitable principles of laches, estoppel and acquiescence in *inter partes* proceedings does not alter this conclusion, as that section states that such principles may be considered and applied "where applicable." The principles are not applicable where the Lanham Act specifically carves out an exception to them.

interest to remove abandoned registrations from the register...."); *Bausch & Lomb, Inc. v. Leupold & Stevens Inc.*, 1986 WL 83320, 1 U.S.P.Q.2d 1497, 1499 (Trademark Tr. & App. Bd.1986) (citing cases); *Southwire Co. v. Kaiser Aluminum & Chem. Corp.*, 1977 WL 22597, 196 U.S.P.Q. 566, 573 (Trademark Tr. & App. Bd.1977); *see also* McCarthy, *Trademarks and Unfair Competition*, § 20:11, 1045 (2d ed. 1984) ["McCarthy"].

The Fourth Circuit has held that the limits placed on PTO cancellation proceedings also apply to court proceedings. *Shakespeare Co. v. Silstar Corp. of America, Inc.*, 9 F.3d 1091, 1098 (4th Cir.1993) (citing Siegrun D. Kane, *Trademark Law* 281 (2d ed.1991)). That means that the language in Section 1064 and its express license to file for cancellation on particular grounds "at any time" is applicable here. Therefore, parties in a court proceeding cannot assert equitable defenses against cancellation claims asserted on the basis of abandonment or other enumerated grounds in § 1064 that allow filing "at any time." *Baniel v. Guild*, 2000 WL 1349254, at *5 (N.D.Ill. Sept. 19, 2000). As the *Baniel* court recognized, the policy reasons that the PTO bars equitable defenses against cancellation proceedings involving abandoned marks apply equally whether the case is before that body or a federal court. 2000 WL 1349254, at *5.

General Cigar posits that this rule contravenes the rationale behind equitable defenses, *i.e.* that parties should not sleep on their rights while a competitor develops good will in a disputed mark. Congress, in drafting the Lanham Act, clearly showed its preference between these two conflicting policies: keeping the registry clear of abandoned marks is more important than preventing entities from sleeping on their rights.

General Cigar cites a number of case that do not involve cancellation proceedings and Section 1064's statutory language permitting filing "at any time" and thus are not applicable.[33] General Cigar presents only two seemingly contradictory cases that involve a cancellation proceeding. In both *Oreck Corp. v. Thomson Consumer Elecs. Inc.*, 796 F.Supp. 1152, 1161 (S.D.Ind.1992) (dismissing trademark cancellation claim on the basis of fraudulent procurement[34] due to laches) and *Joint Stock Soc'y v. UDV N. America Inc.*, 53 F.Supp.2d 692, 721–22 (D.Del.1999) (granting defendant's motion for summary judgment dismissing, *inter alia*, a trademark cancellation claim on the basis of laches), however, the courts either ignored or refused to apply the language of Section 1064. Because it is held that this Court is bound by the language of that section, these cases are inapposite.

## B. General Cigar Abandoned the CO-HIBA Mark Between 1987 and 1992

A determination that a mark has been abandoned defeats the alleged owner's claim of priority:

> Once abandoned, the mark reverts back to the public domain whereupon it may be appropriated by anyone who adopts the mark for his or her own use. Hence a party that is found to have abandoned its mark is deprived of any claim to priority in the mark before the date of abandonment and may regain rights in the mark only through subsequent use after the time of an abandonment.

403 F.Supp. 1145, 1150 (S.D.N.Y.1975) (patent).

**34.** Section 1064 also includes registrations obtained by fraud in its umbrella.

**33.** *E.g.*, *Odetics Inc. v. Storage Tech. Corp.*, 14 F.Supp.2d 800 (E.D.Va.1998) (patent); *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813 (7th Cir.1999) (false advertising and false promotion); *M & T Chems. Inc. v. IBM Corp.*,

*General Cigar Co. v. G.D.M., Inc.*, 988 F.Supp. 647, 658 (S.D.N.Y.1997) ("*G.D.M.*") (*citing Dial–A–Mattress Operating Corp. v. Mattress Madness*, 841 F.Supp. 1339, 1355 (E.D.N.Y.1994) (*citing Manhattan Indus. Inc. v. Sweater Bee by Banff Ltd.*, 627 F.2d 628, 630 (2d Cir. 1980)).) Because it constitutes a forfeiture of a property right, abandonment of a mark must be proven by clear and convincing evidence, and statutory aid to such proof must be narrowly construed. *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir.1980); *see also G.D.M.*, 988 F.Supp. at 658.

■ The determination of abandonment is governed by Section 1127 of the Lanham act, which states, in pertinent part:

A mark shall be deemed to be "abandoned"

(1) when its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances. Nonuse for two consecutive years shall be prima facie abandonment.

15 U.S.C. § 1127 (1993).[35]

■ The Second Circuit has found two elements necessary to find abandonment: (1) non-use and (2) intent not to resume use. *Stetson v. Howard D. Wolf & Assoc.*, 955 F.2d 847, 850 (2d Cir.1992) (*citing Silverman v. CBS, Inc.*, 870 F.2d 40, 45 (2d Cir.1989)).

■ The party claiming abandonment bears the burden of proof as to both elements. However, where the statutory presumption of abandonment has been established by nonuse for more than two consecutive years, the trademark owner must demonstrate that circumstances do not justify the inference of an intent not to resume use. *Exxon Corp. v. Humble Exploration Co.*, 695 F.2d 96, 99 (5th Cir. 1983). This presumption "eliminates the challenger's burden to establish the intent element of abandonment as an initial part of its case." *Imperial Tobacco Ltd. v. Philip Morris, Inc.*, 899 F.2d 1575, 1579 (Fed.Cir.1990); *see Emergency One, Inc. v. American FireEagle, Ltd.*, 228 F.3d 531, 536 (4th Cir.2000) ("Once the presumption is triggered, the legal owner of the mark has the burden of producing evidence of either actual use during the relevant period or intent to resume use.").[36]

■ Defendants must come forward with objective, hard evidence of actual "concrete plans to resume use" in the "reasonably foreseeable future when the conditions requiring suspension abate." *Silverman*, 870 F.2d at 46; *see also Rivard v. Linville*, 133 F.3d 1446, 1449 (Fed.Cir. 1998) ("To prove excusable nonuse, the registrant must produce evidence showing that, under his particular circumstances, his activities are those that a reasonable

---

**35.** The statutory period of nonuse sufficient to constitute a prima facie case of abandonment was increased from two years to three years by the Uruguay Round Agreements Act, Pub.L. No. 103–465, § 521, 108 Stat. 4809, 4981–82 (1994). The amendment was effective January 1, 1996—after the conduct at issue occurred—and the amendment does not expressly call for retroactive application. Therefore, the statute as it was in effect from 1987 to 1992 controls. *Landgraf v. USI Film Products*, 511 U.S. 244, 280 (1994); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) ("Retroactivity is not favored by law. Thus, congres-sional enactments and administrative rules will not be construed to have retroactive effect unless their language requires the result."); *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 837, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990) ("[W]here the congressional intent is clear, it governs.").

**36.** The presumption "is no more than a rebuttable presumption." *Saratoga Vichy Spring*, 625 F.2d at 1044. The presumption shifts the burden of production, but the ultimate burden of proof remains with the challenger. *On-Line Careline, Inc. v. America Online, Inc.*, 229 F.3d 1080, 1087 (Fed.Cir.2000).

businessman, who had a bona fide intent to use the mark in United States commerce, would have taken."). "A bare assertion of possible future use is not enough" to prove an intent to resume use. *Silverman*, 870 F.2d at 47; *see also Imperial Tobacco*, 899 F.2d at 1581 ("In every contested abandonment case, the respondent denies an intention to abandon its mark. . . . [O]ne must, however, proffer more than conclusory testimony or affidavits."); *Rivard*, 133 F.3d at 1449 ("A registrant's proclamations of his intent to resume or commence use in United States commerce during the period of nonuse are awarded little, if any weight.").

This is not the first time that this Court has addressed the issue of whether General Cigar abandoned its rights to the COHIBA mark. The issue was discussed at some length in a different case brought by General Cigar:

> General Cigar does not dispute that no sales of COHIBA cigars took place from 1988 through 1991. Instead, it explains this hiatus resulted from the "restaging" of its COHIBA cigars. The restaging consisted of the switch from the plastic cylindrical package to wooden box, the second registration of the trademark, and commencement of the tobacconist partnership with Dunhill and Mike's Cigars.
>
> Even if General Cigar had not come forward with evidence of an intent to resume use during the 1988 through 1991 hiatus, General Cigar established rights to the mark by filing the second trademark registration in 1992, and conducting sales from 1992 to the present.

*G.D.M.*, 988 F.Supp. at 659 (granting preliminary injunction as General Cigar was likely to prevail on its claim of trademark infringement). Cubatabaco states that this holding is not determinative because the "restaging" cited is not supported by the record in this case. In any case, the

issue facing the Court in *G.D.M.* was not whether General Cigar had proved that it had not abandoned its rights to the COHIBA mark, but whether it was likely to prevail on its claim of trademark infringement. This case is at a different procedural posture and more discovery has taken place. In addition, in *G.D.M.*, the determination of whether abandonment had occurred did not affect the ultimate resolution because of General Cigar's second registration.

■ It is undisputed for the purposes of this motion that General Cigar did not have any commercial use of the COHIBA mark from sometime in 1987 to November 20, 1992—a period of five years. This establishes a presumption of abandonment that General Cigar may rebut by showing valid reasons for nonuse and by proving intent to resume use. The ultimate burden remains with Cubatabaco, however.

General Cigar places primary emphasis on its argument that it withdrew the mark from 1987 to 1992 because of the slump in the cigar market and used the time to plan for a new COHIBA cigar. These constitute reasonable business explanations. *E.g.*, *Star–Kist Foods, Inc. v. P.J. Rhodes & Co.*, 769 F.2d 1393 (9th Cir.1985) (no abandonment where temporary cessation of use caused by changing or depressed market conditions); *Keebler Co. v. Nabisco Brands, Inc.* (N.D.Ill. May 19, 1992) (no abandonment where introduced evidence of tests, plans, and investments of funds in development of new products). However, the claims of "restaging" are belied by the fact that the "new" COHIBA cigar introduced in 1992 was nothing more than an existing General Cigar, the Temple Hall, with a COHIBA label on it. Even the new label was created in the fall of 1992, after the launch of *Cigar Aficionado* with its cover story on the Cuban COHIBA. If General Cigar truly spent five years en-

gaged in ruminating over complex marketing strategies, it apparently did not implement the results. *E.g., Imperial Tobacco*, 899 F.2d at 1582 (development of "marketing strategy" for five years did not excuse non-use because "when Imperial finally made sales of [its] cigarettes, there was no implementation of a complex marketing strategy to introduce them").

▮ In addition, a reasonable business explanation for stopping selling the cigar is insufficient in the absence of a showing of an intention to resume use in the "reasonably foreseeable future." *Silverman*, 870 F.2d at 47.[37] To demonstrate its intent to resume use, General Cigar points to the fact that during the period of nonuse—which coincided with a slump in the cigar market—it prepared a list of 29 marks that it intended to abandon, and that COHIBA was not on the list. The mere fact that General Cigar did not intend to abandon the brand is insufficient as a matter of law. *Silverman*, 870 F.2d at 46 (intent not to resume use is intent not to resume use in foreseeable future, rather than never to resume use at all); *Stetson*, 955 F.2d at 850 ("The 'intent to abandon' language [used by the district court] directly contradicts *Silverman's* specific rejection" of that standard). General Cigar must have intended to do more than merely "warehouse" the mark until it was useful again.[38] It does not in its memorandum produce any other "concrete plans" to resume use.

▮ The only other actions that General Cigar undertook with respect to the COHIBA mark from 1987 to 1992 can only be described as minor activities that fail to establish any intent to resume use of the mark in the reasonably foreseeable future. *Silverman*, 870 F.2d at 47 (intent to resume use could not be proven by "minor activities" such as "challenging infringing uses brought to its attention"); *Rivard*, 133 F.3d at 1449 (finding no intent to resume use where between 1986 and 1991, Rivard "made sporadic trips to the United States, cursory investigations of potential sites for salons, and half-hearted attempts to initiate the business relationships necessary to open a salon"). A minor activity is one that "do[es] not sufficiently rekindle the public's identification of the mark with the proprietor, which is the essential condition for trademark protection." *Silverman*, 870 F.2d at 48. In mid–1989 and the

37. General Cigar's cases do not in any way suggest that a reasonable business explanation—in the absence of an intent to resume use—is alone sufficient. For instance, in *Miller Brewing Co. v. Oland's Breweries Ltd.*, 548 F.2d 349, 352 (Cust. & Pat.App.1976), the court found the five years of non-use did not constitute abandonment where the plaintiff used the time to modernize equipment and address increased demands outside the United States. During that five-year period, however, Miller revealed its intention to resume use by continuing to advertise beer in the United States and by renewing its license in the United States. Similarly, in *Kardex Sys., Inc. v. Sistemco N.V.*, 583 F.Supp. 803, 814–15 (D.Me.1984), it was held that abandonment had not occurred despite more than three years' non-use, because the plaintiff produced the product on demand, rather than for inventory, continued to provide service for the units already sold, and carried an inventory of parts required for repair purposes. The continuing actions of the parties in these two cases evidence their intents to resume use.

38. Warehousing, which is impermissible, occurs when one hoards a mark for future use without concrete intent to use it in the future. *Exxon Corp. v. Humble Exploration Co.*, 592 F.Supp. 1226 (D.C.Tex.1984); *I.H.T. Corp. v. Saffir Pub. Corp.*, 444 F.Supp. 185, 189 (S.D.N.Y.1978) (twelve years of non-use coupled with no contemplated revival of the paper or future plans for use of the mark beyond an abstract desire to resume use at some indefinite time in the future, strongly suggested abandonment); *Procter & Gamble Co. v. Johnson & Johnson, Inc.*, 485 F.Supp. 1185, 1204–08 (S.D.N.Y.1979) (Leval, J.) (condemning voluntary "minor brands" warehousing program).

end of 1991, General Cigar discussed the use of trade dress similar or identical to the Cuban COHIBA trade dress. General Cigar decided not to follow through with this plan based on advice of counsel. These two activities are insufficient. *E.g., Imperial Tobacco,* 899 F.2d at 1582–83 (plaintiff's desire to use the "trade dress similar to that of [defendant]" and its concerns over possible litigation that would arise did not overcome presumption of abandonment). On November 9, 1990, General Cigar wrote a cease and desist letter, asserting that the name "COHOBA" for cigars "infringed on General Cigar's considerable rights in its registration." This single letter too is insufficient to raise a material issue of fact as to intent to resume use. *Silverman,* 870 F.2d at 47 (intent to resume use could not be proven by "minor activities" such as "challenging infringing uses brought to its attention").

 Finally, the testimony of Cullman and others that General Cigar intended to resume use of the COHIBA mark is insufficient in light of the lack of any supporting evidence. To refute an allegation of abandonment, the contesting party must "proffer more than conclusory testimony or affidavits." *Imperial Tobacco,* 899 F.2d at 1581; *see also Cerveceria Centroamericana, S.A. v. Cerveceria India Inc.,* 892 F.2d 1021, (Fed.Cir.1989) ("vague" testimony regarding intent to resume given "little to no weight").

For these reasons, Cubatabaco's motion for summary judgment on the ground of abandonment is granted. Therefore, the 1981 registration and 1986 incontestability declaration are cancelled due to abandon-ment. All claims relating to the 1981 registration and 1986 incontestability declaration are dismissed. The only outstanding claims are those addressing the 1992 new use and 1995 registration.

## V. General Cigar's Equitable Defenses

General Cigar has moved for summary judgment on the basis of its equitable defenses of acquiescence, estoppel and laches. Cubatabaco has moved separately to dismiss these equitable defenses.

### A. Whether General Cigar is Barred From Raising Its Equitable Defenses

As an initial matter, Cubatabaco alleges that General Cigar is barred from raising equitable affirmative defenses on a number of different grounds and moves to dismiss them on these grounds.[39] It claims that General Cigar may not take advantage of equitable defenses because it engaged in fraud in filings with the PTO and intentionally infringed upon the trademark. Further, it claims that equitable defenses may not apply because the potential for likelihood of confusion is great.

### 1. False and Fraudulent Filings

 Other courts in this district have applied the doctrine of "unclean hands"[40] to prevent the application of equitable defenses in trademark infringement cases. *Nat'l Baseball Hall of Fame and Museum, Inc. v. All Sports Promotions, Inc.,* 58 U.S.P.Q.2d 1114, 2001 WL 196755, at *11 (S.D.N.Y.2001) (evidence of unclean hands precluded summary judgment on acquiescence defense in

---

**39.** As discussed above in Part IV.A., General Cigar may not use the equitable defenses against Cubatabaco's cancellation claims based on abandonment and fraud.

**40.** Under the doctrine of "unclean hands," a court "may decline to exercise its equitable powers in favor of a party whose unconscionable act ... has immediate and necessary relation to the matter he seeks in respect of the matter in litigation." *Aris–Isotoner Gloves,* 792 F.Supp. at 972 (internal citations omitted).

trademark infringement case); *Aris–Iso-toner Gloves, Inc. v. Berkshire Fashions, Inc.*, 792 F.Supp. 969, 972 (S.D.N.Y.1992) (unclean hands of defendant in trademark dispute prevented application of defense of laches); *see also AccuScan Inc. v. Xerox Corp.*, 1998 WL 60991, at *5 n. 4 (S.D.N.Y. 1998) (disputed issues of material fact precluded summary judgment on the defense of laches in patent infringement case). As discussed below, however, any purposeful delay on the part of the plaintiff in order to take advantage of the alleged infringer's use of the mark will vitiate this rule.

Cubatabaco alleges that General Cigar made fraudulent statements to the PTO in its 1978 registration and in its 1986 incontestability declaration. Both of these occurred prior to General Cigar's new use in 1992, and therefore this claim is no longer applicable due to the determination that General Cigar abandoned its claims until that new use in 1992.

### 2. *Intentional Infringement*

■ The Second Circuit has held that intentional infringement acts as a bar to the assertion of a laches defense against an infringement suit seeking injunctive relief. *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir.2000) ("Intentional infringement is a dispositive, threshold inquiry that bars further consideration of the laches defense, not a mere factor to be weighed in the balancing of the equities...."); *see also Harlequin Ent., Ltd. v. Gulf & Western Corp.*, 644 F.2d 946, 950 (2d Cir.1981) (laches does not bar injunctive relief if intentional infringement); *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1344 (2d Cir.1975) (same); *but see Odetics Inc. v. Storage Technology Corp.*, 14 F.Supp.2d 800 (E.D.Va.1998) (concluding that infringer of patent could raise a laches claim even though it was found to have willfully infringed patent in question).

"While an infringer claiming laches need not be in total ignorance of another's mark, it must be able to demonstrate the absence of any intent to confuse and deceive the public." *Cuban Cigar Brands N.V. v. Upmann Intern.*, 457 F.Supp. 1090, 1098–99 (S.D.N.Y.1978). McCarthy has identified two reasons underlying this rule: "(1) Such intent proves a clear case of infringement. In such a clear case, the right of customers not to be confused prevails over plaintiff's slowness in suing. (2) A deliberate infringer cannot establish the traditional elements of estoppel: that is, good faith reliance on the plaintiff's failure to file suit promptly." McCarthy, *supra*, § 31:9, at 31–27.

■ Cubatabaco alleges that General Cigar intentionally infringed upon its trademark. At the time of the 1995 registration (begun in 1992), Cubatabaco itself had not registered the COHIBA trademark in the United States. However, Cubatabaco might have had a right to the mark if COHIBA was a well-known mark in the United States prior to General Cigar's first new use of the mark in 1992. As discussed, *infra*, this question presents an issue of material fact.

Even if General Cigar knew that Cubatabaco planned someday to use and register the COHIBA mark in the United States, that is insufficient to support a finding of intentional infringement if Cubatabaco did not already have a right to the COHIBA mark. *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 504 (7th Cir.1992) (party may register mark it knows another entity intends to use because "intent to use a mark creates no rights a competitor is bound to respect"); *Reflange Inc. v. R–Con Int'l*, 1990 WL 354565, 17 U.S.P.Q.2d 1125, 1130–31 (Trademark Tr. & App. Bd.1990) ("the law pertaining to registration of trademarks does not regulate all aspects of business morality, and adopting

of a mark with knowledge of another's intent to use does not give rise to cognizable equities").

 A few courts have held that equitable defenses may, nonetheless, bar a plaintiff's suit for intentional infringement where there is significant and purposeful delay. *E.g. Joint Stock Society,* 53 F.Supp.2d at 721–22 (citing cases). These cases stand for the proposition that where the infringee makes an unconscionable transgression—purposefully sitting by to take advantage of the infringer's work—it cannot seek the court's protection.[41] The question is not merely whether the infringee knew of the infringing mark, but whether it purposefully did not act in order to enjoy the fruits of the infringee's labor. First, the delay at issue here, as a result of General Cigar's abandonment, is a handful of years—hardly a significant delay. There is no evidence that Cubatabaco delayed bringing suit in order to somehow take advantage of General Cigar's efforts. Cubatabaco has consistently been selling and promoting its COHIBA cigars around the world since 1982, and in Cuba since the 1970's. Further, until the fall of 1997, months after the cancellation petition was filed, sales of General Cigar's COHIBA never rose above 0.05% of its annual sales and was not even in the same "super-premium" category as the Cuban COHIBA.

Therefore, because a material issue of fact exists as to whether intentional infringement occurred, and because Cubatabaco did not unconscionably and purposefully use the delay, General Cigar may not prevail on its equitable defenses in summary judgment, because it may not be permitted to raise them at all.

### 3. *Likelihood of Confusion*

 Where a plaintiff presents a strong showing of likelihood of confusion, equitable defenses will not bar its claims. McCarthy, *supra,* § 31.10, at 31–332 (2001) ("A court will tolerate delay if plaintiff proves a strong case that customers are likely to be confused."); *id.* at § 31:41, at 31–86 ("[A] strong showing of likelihood of confusion can trump even a proven case of acquiescence....").

Unlike most other kinds of litigation between private parties, trademark litigation is profoundly affected by considerations of public interest. Thus, when the likelihood of confusion is not "reasonably in doubt," laches and acquiescence are not available to bar relief. *American Auto. Ass'n v. AAA Ins. Agency Inc.,* 618 F.Supp. 787 (D.C.Tex.1985). In such cases, even a lengthy delay in bringing suit will not bar injunctive relief to protect the public from confusion, although it may bar recovery of damages. *Id. (citing McLean v. Fleming,* 96 U.S. 245, 253, 6 Otto 245, 24 L.Ed. 828 (1877); *Menendez v. Holt,* 128 U.S. 514, 523–24, 9 S.Ct. 143, 32 L.Ed. 526 (1888)).

 General Cigar challenges the application of this doctrine where, as here, it is the senior user of the mark in the United States, and Cubatabaco is not even permitted to sell its COHIBA cigars in the United States. However, it is not necessary that Cubatabaco's mark be registered

41. As Judge Learned Hand wrote:
Even in 1930 when for the first time it really began to be injured, [plaintiff] did nothing: not a word of protest, or a gesture of complaint, escaped it for six years more; and still the milk business [of defendant] kept increasing. What equity it can have the hardihood now to assert; how can it expect us to stifle a competition which with complete complaisance, and even with active encouragement, it has allowed for years to grow like the mustard tree; why we should destroy a huge business built up with its connivance and consent; this we find it impossible to understand.
*Dwinell–Wright Co. v. White House Milk Co.,* 132 F.2d 822 (2d Cir.1943).

in the United States nor that its product be able to be sold in the United States for the doctrine of likelihood of confusion to apply. *E.g. The Sports Authority Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 963 (2d Cir.1996) ("direct competition between the products is not a prerequisite to relief") (quotations omitted); *Maison Prunier v. Prunier's Restaurant & Cafe Inc.*, 159 Misc. 551, 288 N.Y.S. 529, 532–33 (1936) ("actual competition" not essential); *Vaudable v. Montmartre Inc.*, 20 Misc.2d 757, 193 N.Y.S.2d 332, 335 (N.Y.Sup.Ct. 1959) (no sales in United States); *Fund of Funds Ltd. v. First American Fund of Funds Inc.*, 274 F.Supp. 517, 524 (S.D.N.Y. 1967) (mutual funds could not legally be sold in United States or to American citizens). Whether direct competition exists between the two brands is, however, a factor to be considered in determining whether there is a likelihood of confusion, as discussed, *infra.*

▇ To determine the likelihood of confusion posed by a challenged use, courts in this Circuit are guided by the eight factors articulated by the Honorable Henry J. Friendly in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.1961). These factors are: (1) the strength of the plaintiff's mark; (2) the similarity of the plaintiff's and defendant's marks; (3) the competitive proximity of the services; (4) the likelihood that plaintiff will "bridge the gap" and offer a service like defendant's; (5) actual confusion; (6) good faith on the defendant's part; (7) the quality of defendant's service; and (8) the sophistication of buyers. *Id.; see also Estee Lauder Inc. v. The Gap Inc.*, 108 F.3d 1503, 1510 (2d Cir.1997); *The Sports Authority*, 89 F.3d at 960.

Cubatabaco primarily points to two of the factors, the similarity of the marks and actual consumer confusion. The two marks at issue are identical ("COHIBA") and are used for the same product, cigars.

Consumer confusion in such a situation is "inevitable." *Pappan Ent. Inc. v. Hardee's Food Sys. Inc.*, 143 F.3d 800, 804 (3d Cir.1998) ("where the identical mark is used concurrently by unrelated entities, the likelihood of confusion is inevitable"); *Metro Traffic Control Inc. v. Shadow Network Inc.*, 104 F.3d 336, 339 (Fed.Cir.1997) ("confusion was 'so likely that it is virtually inevitable because the parties are using the identical marks for the identical services'" (citation omitted)); *Patsy's Brand, Inc. v. I.O.B. Realty Inc.*, 58 U.S.P.Q.2d 1048, 2001 WL 170672, at *12 (S.D.N.Y. 2001) ("the use of the same name and very similar labels on the same product must invariably cause consumer confusion"); *Cullman Ventures Inc. v. Columbian Art Works Inc.*, 717 F.Supp. 96, 127 (S.D.N.Y. 1989) ("the products are more than confusingly similar—they are virtually identical—and thus consumer confusion is inevitable") (*citing Mushroom Makers Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47–48 (2d Cir.1978)).

Cubatabaco cites several market research studies showing such confusion. In addition, Cubatabaco points out that General Cigar has launched the "Cohiba Extra Vigoroso" with a trade dress that eliminates what Cullman had claimed was one of the principal methods adopted by General Cigar to guard against consumer confusion—"clearly marking" the box and cigar to show that the cigar was made in the Dominican Republic.

The other factors raise material issues of fact. Whether General Cigar acted in good faith in adopting the mark is a genuine issue of material fact. Documents predating the 1995 registration suggest that General Cigar did in fact intend to capitalize on the Cuban COHIBA's reputation. The timing of the new use and second registration of the COHIBA mark—shortly after the premier issue of *Cigar Aficion-*

*ado* and its laudatory treatment of the Cuban COHIBA—also support this interpretation. Yet, General Cigar first applied to register the mark in 1978, prior to the Cuban COHIBA's launch on the international market. While it has now been determined that it abandoned its rights to the mark, General Cigar might not have recognized that.

In addition, it is a disputed issue as to the quality of General Cigar's COHIBA cigars. Although its latest incarnation of COHIBA has received several high evaluations from *Cigar Aficionado*, those rankings are not consistently as high as those of the Cuban COHIBA. The Cuban COHIBA has the reputation as the best cigar in Cuba and, perhaps, the world—a reputation that General Cigar's COHIBA has not surpassed according the evidence presented here.

The likelihood of Cubatabaco "bridging the gap" and entering the U.S. cigar market is dependent upon whether the political tide will shift to bring an end to the Cuban embargo. However, the end of the embargo appears more likely now than in the past,[42] and in such event, as the interviews with Padron reveal, Cubatabaco will almost definitely bridge the gap. Further, although at this time Cubatabaco may not itself sell its cigars in the United States, the embargo does not prevent a Cubatabaco-*sponsored* cigar from being sold in the United States under certain circumstances.[43]

Finally, it is controverted as to whether purchasers of COHIBA cigars are sophisticated. While purchasers of fine cigars tend to be knowledgeable and would realize that Cuban COHIBAs are not legally available in this country, Cubatabaco has presented market research to suggest that buyers who would be influenced by the "Cuba mystique" are not sophisticated purchasers. Therefore, a person who would buy a COHIBA because of its "mystique" may not understand that the General Cigar COHIBA is not sponsored by or related to the Cuban COHIBA.

■ Cubatabaco's claim of likelihood of confusion is therefore not brought into "reasonable doubt" for the purposes of this motion. This finding further supports the determination that General Cigar should not be able to employ its equitable defenses to dispose of Cubatabaco's claims on summary judgment until these factual issues are resolved.

Because there exists a genuine issue of material fact as to whether General Cigar may even raise its equitable defenses, its motion for summary judgment on those defenses must be denied. This ruling does not, however, forestall Cubatabaco's motion to dismiss these defenses.

Does General Cigar Own a Valid Trademark for the name "Cohiba" in the United States?, 21 Loy.L.A. Int'l & Comp.L.J. 633, 637 (August 1999) (discussing why "the United States may soon reconsider the continued enforcement of the Cuban embargo").

**43.** Cubatabaco points out that a Dominican Republic company with 24% Cubatabaco ownership and with Cubatabaco providing quality control and technical advice could sell a "Cohiba" cigar made with non-Cuban ingredients in the United States. 31 C.F.R. §§ 515.204, 515.302–.303.

**42.** The political tides appear to be turning, most recently with Former President Jimmy Carter's visit to Cuba. *E.g.,* Mike Williams et al., Carter trip's effect won't be overnight, Atlanta Journal–Const., at A14, 2002 WL 3723090 (May 19, 2002) ("Carter's visit could boost the growing movement in Congress to end the Cuban embargo...."); Rafael Lorente, Calls for Free Trade with Cuba Get Louder, Orlando Sentinel, at A1 (May 5, 2002) ("Momentum is building to end the United States' embargo against Cuba...."). *See also* Mark D. Nielsen, Cohiba: Not Just Another Name, Not Just Another Stoogie:

## B. *General Cigar Cannot Establish the Equitable Defenses as a Matter of Law*

Cubatabaco claims that General Cigar has failed to establish the elements of acquiescence, estoppel, and laches.

### 1. *Acquiescence and Estoppel*

The affirmative defenses of acquiescence ("estoppel by acquiescence") and equitable estoppel are closely related.

▮ The defense of acquiescence "is available when a plaintiff has responded to a defendant's actions with implicit or explicit assurances upon which the defendant relied." *H.G. Shopping Centers, L.P. v. Birney*, 59 U.S.P.Q.2d 1109, 1115 (S.D.Tex. 2000) (*citing Elvis Presley Enterprises Inc. v. Capece*, 141 F.3d 188, 206 (5th Cir.1998)). Acquiescence is used "only in those cases where the trademark owner, by affirmative word or deed" conveys its consent to another. McCarthy, *supra*, § 31.41, at 31–85; *see also Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*, 433 F.2d 686, 704 (2d Cir.1970) ("As distinguished from laches, acquiescence constitutes a ground for denial of relief only upon a finding of conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that the plaintiff would not assert his trademark rights against the defendant."). Whether the claim of acquiescence is sufficient to bar relief "depends upon consideration of the circumstances of each particular case and a balancing of interests and equities of the parties." *Carl Zeiss*, 433 F.2d at 704; *Tri–Star Pictures Inc. v. Leisure Time Productions B.V.*, 17 F.3d 38, 44 (2d Cir. 1994); *Saratoga Vichy Spring*, 625 F.2d at 1040; *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1036, 1043 (Fed.Cir.1992) (en banc).

▮ Similarly, to assert equitable estoppel, a defendant must show that (1) plaintiff's misleading communication, with plaintiff's knowledge of the true facts, prompted the defendant to infer that the plaintiff would not enforce its rights against the defendant; (2) the defendant relied on that conduct; and (3) the defendant would be prejudiced if the plaintiff were allowed to bring suit. *H.G. Shopping Centers*, 2000 WL 33538621, 59 U.S.P.Q.2d at 1115.

Acquiescence focuses on the plaintiff's "response" to defendant's infringing actions. That means any "response" that would constitute acquiescence must come after Cubatabaco was aware of General Cigar's new use of the COHIBA mark. At the earliest, Cubatabaco learned in January 1994 that General Cigar was using the COHIBA mark when it received a delivery of COHIBA cigars that explicitly stated they were being sent only for the purposes of trademark registration.

Similarly, equitable estoppel requires a misleading communication with plaintiff's knowledge of the true facts. Therefore, the inquiry again must begin with Cubatabaco's awareness that General Cigar was intending to use and register the COHIBA mark. Cubatabaco suggests that it was only recently aware of the "true facts." It points to a 1994 interview with Cullman in which he said that General Cigar did not intend to use the COHIBA mark in the immediate future. However, at least for the purposes of this motion, Cubatabaco should have known, upon receiving the box of cigars sent for the purposes of trademark registration, that General Cigar was pursuing the mark. Therefore, the inquiry begins with Cubatabaco's actions after January 1994.

▮ General Cigar cites (1) Cubatabaco's 1996 registration of the COHIBA trade dress in the United States; (2) statements made by Cubatabaco's director, Padron, in two articles in *Cigar Aficionado;* and (3) Cubatabaco's failure to contest

General Cigar's apparent ownership of the COHIBA mark from 1994 to 1997.

General Cigar claims that Cubatabaco's registration of the COHIBA trade dress in 1996, without any challenge to General Cigar's existing registration of the COHIBA mark, communicated to the world at large and to General Cigar that Cubatabaco acknowledged General Cigar's U.S. ownership of the COHIBA mark. Cubatabaco is persuasive in arguing that its efforts to protect its designs from what it considered further attempts by General Cigar to misappropriate them may not as a matter of law constitute grounds for acquiescence or estoppel.

The two Padron interviews took place prior to January 1994.[44] The interviews were therefore not a "response" to General Cigar's actions and cannot constitute acquiescence. Further, the interviews were not made with the true knowledge of the facts—that General Cigar was pursuing a new registration for the COHIBA mark. Therefore, General Cigar may not rely on the interviews to show conduct supporting its acquiescence and estoppel claims. ·

█ Finally, silence may constitute cause for equitable estoppel if a duty to speak exists. *Kosakow v. New Rochelle Radiology Assoc.*, 274 F.3d 706, 725–26 (2d Cir.2001). A duty to speak may arise if the party's silence will mislead the infringer into believing that an infringement claim will not be asserted. *General Elec.*

*Capital Corp. v. Eva Armadora, S.A.*, 37 F.3d 41, 45 (2d Cir.1994) ("Silence in the face of an explicit contrary assumption by an innocent party may constitute a concealment of facts or a false representation for estoppel purposes."); *Forest Laboratories Inc. v. Abbott Laboratories*, 96 Civ. 159–A, 1999 WL 33299123, at * 22 (W.D.N.Y. June 23, 1999) (holding party was estopped by silence).

Cubatabaco's silence lasted from January 1994 until, at the latest, January 1997, when Cubatabaco filed its cancellation petition. *Elvis Presley Enterprises Inc. v. Capece*, 141 F.3d 188, 205 (5th Cir.1998) ("Any acts after receiving a cease and desist letter are at defendant's own risk.") (citing *Conan Properties Inc. v. Conans Pizza Inc.*, 752 F.2d 145, 151–52 (5th Cir. 1985)); *Piper Aircraft Corp. v. Wag–Aero Inc.*, 741 F.2d 925 (7th Cir.1984) (period of alleged laches ended when defendant received letter from plaintiff objecting to defendant's use of the Piper name in catalog). *See also* Restatement (Third) of Unfair Competition 31, at 320–21 (1995). Moreover, in January 1994, Cubatabaco received a box of the COHIBA-branded Temple Hall cigars with a note stating that the box was not sold as a regular item and that it was being produced by General Cigar solely for the purposes of its trademark registration. The COHIBA-branded Temple Hall cigars were not advertised and were only sold through two tobacconists. In light of these facts, Cubatabaco did not as a matter of law have a duty to speak.[45]

---

**44.** The later interview took place in December 1993 and was printed in early 1994. The printing date does not change the fact that Padron was not responding to General Cigar's actions and did not have knowledge of the true facts. In any case, the quoted excerpt does not support a claim of acquiescence or estoppel. The very first line of the excerpt from Padron states: "[T]here is going to be a fight." That statement is later contradicted by Padron's almost immediate statement that "we are not going to fight in order to get our cigars into the United States." In

light of this confusion, General Cigar could not have relied on the statement, "we are not going to fight...."

**45.** By contrast, it would be a different matter if Cubatabaco had remained silent for up to three years after the launch of General Cigar's super-premium COHIBA. In that case, General Cigar had spent millions of dollars in advertising and sold approximately 509,000 COHIBAs from August to December of 1997 alone, and close to one million COHIBAs per year in the following years. In such a situa-

General Cigar has failed to establish evidence of any acts, conduct or omission on the part of Cubatabaco on which it could rely. Therefore, its affirmative defenses of acquiescence and estoppel are dismissed.

### 2. *Laches*

■ Laches requires defendants to show "[t]hat plaintiff had knowledge of the defendant's use of its marks [and] that plaintiff inexcusably delayed in taking action with respect thereto." *Cuban Cigar Brands,* 457 F.Supp. at 1096 (internal citations omitted); *see also Saratoga Vichy Spring,* 625 F.2d at 1040.

■ A presumption of laches arises in a trademark action when the plaintiff does not bring suit within the six-year statute of limitations applicable to state-law fraud in New York. *Conopco Inc. v. Campbell Soup Co.,* 95 F.3d 187, 191–92 (2d Cir.1996); *see also Ameritech Inc. v. American Information Technologies Corp.,* 811 F.2d 960, 963 (6th Cir.1987) ("There is a strong presumption that plaintiff's delay ... is reasonable so long as the analogous statute of limitations has not elapsed."). Further, this six-year period does not run until plaintiffs discover or should have discovered the facts that create the cause of action. *Carell v. Shubert Org. Inc.,* 104 F.Supp.2d 236, 260 (S.D.N.Y.2000) (citing N.Y. CPLR § 213(8)); *see also Harley–Davidson, Inc. v. O'Connell,* 13 F.Supp.2d 271, 279 (N.D.N.Y.1998). Cubatabaco discovered the new use in January 1994 at the earliest. Further, it filed a cancellation petition three years later, in January 1997. Therefore, the presumption does not arise

here because the period of delay is, at most, three years.

■ Even if the statute of limitations has not run, the laches defense may still be applicable. *Peyser v. Searle Blatt & Co.,* 2000 WL 1071804, at *5 (S.D.N.Y. Aug. 2, 2000). In such a situation, however, there is no presumption of laches and the burden remains on the defendants to prove the defense. *Conopco,* 95 F.3d at 191. A delay of up to three years does not constitute the "inexcusable delay" in the particular circumstances presented here. As discussed earlier, from January 1994 to January 1997, General Cigar was selling an existing cigar with a COHIBA label attached to it. There was no advertising, and cigars were sold only through the two retailers. Sales constituted a mere half a percent of General Cigar's annual sales of premium cigars at that time. In light of these factors, it was not inexcusable that Cubatabaco did not act until up to three years after discovery of the new use.

Because Cubatabaco did not unreasonably delay, General Cigar's laches claim is dismissed.

### VI. *Cubatabaco's Motion for Partial Summary Judgment*

Cubatabaco has moved for partial summary judgment on its Article 7 and 8 claims under the IAC, Article 6–bis claim under the Paris Convention, New York common law claim, and claim under the Federal Trademark Dilution Act ("FTDA"). General Cigar opposes summary judgment on these claims as well as others not addressed in Cubatabaco's motion for summary judgment.[46]

---

tion a clear duty to speak would arise. That same duty is not present here, however.

**46.** General Cigar also discusses the merits of Cubatabaco's claims regarding (1) Section 10–bis of the Paris Convention (Count II); (2) Article 20 of the IAC (Count IV); (3) trade-

mark infringement under Section 43(a) of the Lanham Act (Count VII); and (4) state law dilution claims (Count XII). These arguments will not be addressed as they are not before the Court and should be the subject of a separate motion for summary judgment on the merits by General Cigar if it so chooses.

## A. *Cubatabaco's Treaty Claims*

As an initial matter, General Cigar argues that Cubatabaco cannot rely on the IAC and Paris Convention because the provisions on which it relies do not have the force of law in the United States. It asserts that the treaties are not self-executing and therefore must be executed by legislation, *i.e.* the Lanham Act, and that the Lanham Act does not encompass the substantive provisions on which Cubatabaco relies for this summary judgment motion.

### 1. *Inter–American Convention*

Both Cuba and the United States are parties to the IAC. The treaty remains in force between the United States and Cuba notwithstanding the embargo on trade between the two countries. U.S. Dep't of State, *Treaties in Force* 393 (2000). Thus, the IAC, along with the Paris Convention, governs trademark relations between the two countries.

This Circuit has recently addressed the issue of whether the Inter–American Convention provides additional substantive rights other than those available under the Lanham Act. *Havana Club Holding S.A. v. Galleon S.A.*, 203 F.3d 116, 124 (2d Cir. 2000).

In *Havana Club,* a Cuban rum producer, Havana Club, brought an action against an American rum producer, Bacardi, alleging trademark infringement and false designation of origin. Before the Cuban revolution, Havana Club rum was produced by a private corporation owned principally by the Arechabala family and was shipped to the United States. After the revolution, the Cuban government seized the assets of the corporation. The resulting Cuban rum

company registered the Havana Club trademark with Cuban authorities in 1974 and with the United States in 1976. The United States registration was revoked in 1997. Also in 1997, the Bacardi Rum company purchased the rights of the Arechabala family to, *inter alia,* the Havana Club trademark.

Looking to legislative history, the Court held that the IAC was self-executing, but that, regardless, Congress incorporated rights under the IAC into Section 44 of the Lanham Act. Therefore, Cubatabaco "must assert its rights under the IAC pursuant to section 44(b) of the Lanham Act." *Id.* at 128.

Section 44(b) provides:

Any person whose country of origin is a party to any convention or treaty relating to trademarks, trade or commercial names, or the repression of unfair competition, to which the United States is also a party, or extends reciprocal rights to nationals of the United States by law, shall be entitled to the benefits of this section under the conditions expressed herein to the extent necessary to give effect to any provision of such convention, treaty or reciprocal law, in addition to the rights to which any owner of a mark is otherwise entitled by this Act.

15 U.S.C. § 1126(b). Cubatabaco is therefore "entitled to the benefits" of Section 44 "under the conditions expressed herein to the extent necessary·to give effect to any provision of such convention...."

Havana Club filed a claim, *inter alia,* to enjoin Bacardi from selling rum labeled Havana Club under Section 44(b) and (h) of the Lanham Act and Chapter III of the IAC. The Court held that Section 44(h) [47] of the Lanham Act only reaches substan-

---

**47.** Section 44(h) provides:

Any person designated in subsection (b) of this section is entitled to the benefits and subject to the provisions of this chapter shall be entitled to effective protection against unfair competition, and the remedies provided by this chapter for infringement of marks shall be available so far as they may be appropriate in repressing acts of unfair competition.

tive provisions of the IAC that are "related to the repression of unfair competition." 203 F.3d at 135 n. 19. One of Havana Club's Section 44(h) claims sought to apply the substantive provisions of Article 23, concerning "Repression of False Indications of Geographical Origin or Source". The Court held that it could "not rely on this provision in asserting its section 44(h) claim, however, because the IAC does not treat rights under article 23 as rights related to the repression of unfair competition." 203 F.3d at 135 n. 19.

 The Court did not clarify which sections of the IAC concern "rights related to the repression of unfair competition." However, Chapter IV of the IAC (Articles 20, 21 and 22) is explicitly labeled "Repression of Unfair Competition." Further, the Court appeared to accept that Section 44(h) at the very least embraces the substantive provisions of one of the articles in Chapter IV, Article 21(c).[48] From this, it may be surmised that Chapter IV concerns "rights related to the repression of unfair competition and that Section 44(h) incorporates the substantive provisions of Articles 20, 21, and 22."[49]

Cubatabaco has moved for summary judgment on its claims under Article 7[50] and 8[51] of the IAC. In order for Section

---

48. Havana Club also asserted a claim under Article 21(c). Article 21(c) expressly states that it will be enforceable only if the conduct it proscribes is not "effectively dealt with" in domestic law. The Court concluded that the plaintiff failed to state a viable claim as it "amounts to little more than the reassertion of its section 43(a) claim because article 21(c) of the IAC prohibits a subset of the conduct already effectively prohibited under American law by section 43(a)." Id. at 134–35. Therefore, the Court appeared to except that Section 44(h) encompassed the terms of Article 21(c).

49. Although Cubatabaco has not moved for summary judgment on these grounds, it has stated claims under Articles 20 and 21 of the IAC. These provisions therefore have the force of law under Section 44(h).

50. Article 7 provides:
Any owner of mark protected in one of the Contracting States in accordance with its domestic law, who may know that some other person is using or applying to register or deposit an interfering mark in any other of the Contracting States, shall have the right to oppose such use, registration or deposit and shall have the right to employ all legal means, procedure or recourse provided in the country in which such interfering mark is being used or where its registration or deposit is being sought, and upon proof that the person who is using such mark, or applying to register or deposit it, had knowledge of the existence and continuous use in any of the Contracting States of

the mark on which opposition is based upon goods of the same class the opposer may claim for himself the preferential right to use such mark in the country where the opposition is made or priority to register or deposit it in such country, upon compliance with the requirements established by the domestic legislation in such country and by this Convention.

51. Article 8 provides, in pertinent part:
When the owner of a mark seeks the registration or deposit of the mark in a Contracting States other than that of origin of the mark and such registration or deposit is refused because of the previous registration or deposit of an interfering mark, he shall have the right to apply for and obtain the cancellation or annulment of the interfering mark upon proving, in accordance with the legal procedure of the country in which cancellation is sought, the stipulations in Paragraph (a) and [ (b) ]:
(a) That he enjoyed legal protection for his mark in another of the Contracting States prior to the date of the application for the registration or deposit which he seeks to cancel; and
(b) That the claimant of the interfering mark, the cancellation of which is sought, had knowledge of the use, employment, registration, or deposit in any of the Contracting States of the mark for the specific goods to which said interfering mark is applied, prior to adoption and use thereof or prior to the filing of the application or deposit of the mark.

44(h) to reach these provisions, they must involve "rights related to the repression of unfair competition." Articles 7 and 8 may be found in Chapter II of the IAC, labeled "Trademark Protection." Cubatabaco argues that Articles 7 and 8 involve the repression of unfair competition and quotes a Second Circuit opinion from 1953 that states that "infringement is itself a form of 'unfair competition.'" *American Automobile Ass'n v. Spiegel*, 205 F.2d 771, 774 (2d Cir.1953) (Hand, J.); *see also* H.R.Rep. 79–1333, 79th Cong., 2d Sess., at 4 (1946) ("[T]here is no essential difference between trade-mark infringement and unfair competition. Unfair competition is the genus of which trade-mark infringement is one of the species.").

Based on this logic, however, it would appear that all provisions of the IAC would be encompassed by Section 44(h). While a neat argument, it is undermined by the *Havana Club* ruling. Cubatabaco cites one portion of *Havana Club* to support this contention, noting that the Court held that the IAC's protection against a United States trademark infringing upon a foreign trade name—a provision it describes as "parallel" to Articles 7 and 8— was incorporated by Section 44. 203 F.3d at 128. It is true that it is incorporated by Section 44, but by subsection (g) of that section, rather than subsection (h), under which Cubatabaco has made its claims. *Id.* Section 44(g) provides that owners of foreign trade names may seek protection against infringement even in the absence of registration.[52] Therefore, the parallel provision required an explicit statement from Congress that no registration was required. Moreover, the *Havana Club* Court rejected claims that Section 44(h) encompassed Article 23 of the IAC, which involves the repression of false indications

of geographical origin. That provision also generally protects against unfair competition in the form of persons falsely labeling their goods to the detriment of those who are actually selling goods from a particular location.

■ In essence, Cubatabaco has invoked Articles 7 and 8 of the IAC to obtain the right of ownership of the COHIBA mark without registering its COHIBA trademark in the manner that United States law requires. As General Cigar points out, this result would directly undermine the Congressional purpose of encouraging registration in order to provide notice to other users who may have interest in the mark. *See In re Int'l Flavors & Fragrances*, 183 F.3d 1361, 1367 (Fed.Cir. 1999) ("Entrepreneurs, for example, who plan to promote and to sell a new product under a fanciful mark, should be able to rely on a search of the trademark registry"); *Bongrain Int'l Corp. v. Delice de France*, 811 F.2d 1479, 1485 (Fed.Cir.1987) ("One of the policies sought to be implemented by the Act was to encourage the presence on the register of trademarks of as many as possible of the marks in actual use so that they are available for search purposes.").

Cubatabaco retorts to this policy argument that Articles 7 and 8 support the Congressional policy, as they both entail the eventual registration of the foreign mark and cancellation of the mark registered in the United States. This argument ignores the fact that for some variable number of years, the foreign mark has not been registered. It also ignores the fact that Congress has specifically carved out how owners of trademarks registered in other countries may obtain a U.S. registration. Under Section 44(d), a party that

---

52. Section 44(g) provides: "Trade names or commercial names of persons described in subsection (b) of this section shall be protect-ed without the obligation of filing or registration whether or not they form parts of marks."

has applied for, but not yet received, a registration in a signatory nation may file a U.S. application within six months of filing its foreign application. If and when the foreign registration issues and if the trademark otherwise qualifies for registration under U.S. law, a U.S. registration will issue, with U.S. priority rights retroactive to the date upon which the foreign application was filed. Therefore, if the party fails to file within six months of its registration, or if someone else has used the mark in the United States prior to the foreign registration, the first U.S. user will have priority rights in the mark.

Under Section 44(e), a foreign party that has already registered its mark in a convention nation may submit a certified copy of that registration to the U.S. PTO at any time. A U.S. registration then will issue, if the mark otherwise qualifies for registration under U.S. law, but without special priority rights. Therefore, if someone else begins to use the mark in U.S. commerce before the foreign party submits a certified copy of the foreign registration to the U.S. PTO, the first U.S. user will have priority in the mark.

If Cubatabaco were correct, the claimant of a U.S. trademark right based on foreign registration would be better off not registering its mark, since it would not have to incur the expense of registration and maintenance fees, and would not have to maintain its registration through use in the United States or the filing of papers to establish excusable non-use. Further, the owner of the prior foreign registration could benefit by waiting until the owner of the United States mark had established a good reputation for the mark and taking advantage of these efforts. While it is true that owners of trademarks registered outside the United States are entitled to protection, Congress has decided in the Lanham Act that they are not entitled to the kind of sword/shield defense that Cubatabaco seeks.

Such result would also contradict provisions of the IAC which contemplate that foreign parties should act to secure and maintain their rights. *E.g.* IAC, Art. 2 (person who desires to obtain a trademark protection must apply for protection); Art. 3 (contemplating compliance with "formal provisions of domestic law" for registration); Art. 10 (period of registration shall be fixed by state).

In light of the foregoing, Articles 7 and 8 of the IAC are not "related to the repression of unfair competition" and are not within the ambit of Section 44(h). Therefore, Cubatabaco's claims under Articles 7 and 8 of the IAC are dismissed.

### 2. *The Paris Convention*

Both Cuba and the United States are parties to the Paris Convention.[53]

There is a divergence in authority as to whether the Paris Convention is self-executing. *Compare Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633, 640–44 (2d Cir.1956) (in dictum: Paris Convention is self-executing), *cert. denied* 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956); *Davidoff Extension S.A. v. Davidoff Int'l Inc.*, 1983 WL 203, 221 U.S.P.Q. (BNA) 465, 467 (S.D.Fla.1983) (relying solely on *Vanity Fair* in holding that Paris Convention is self-executing) *with In re Compagnie Generale Maritime*, 993 F.2d 841, 856 & n. 18 (Fed.Cir.1993) (Nies, J., dissenting) (Paris Convention is not self-executing); *L'Aiglon Apparel, Inc. v. Lana Lobell Inc.*, 214 F.2d 649 (3d Cir.1954) (same) (cited approvingly in *BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.*, 229 F.3d

---

**53.** The United States first became a party on May 30, 1887, and Cuba on November 17, 1904. *See* World Intellectual Property Organization, Intellectual Property Protection Treaties, at http://www.wipo.org/treaties/ip/paris/ (last visited June 19, 2002).

254, 259 n. 1 (3d Cir.2000)); *Ortman v. Stanray Corp.*, 371 F.2d 154, 157 (7th Cir. 1967) (same); *Int'l Cafe, S.A.L. v. Hard Rock Cafe (U.S.A.), Inc.*, 252 F.3d 1274, 1277 n. 5 (11th Cir.2001) (same).[54]

 There is no need to determine whether *Vanity Fair* is still controlling as to this issue, however, because of the *Havana Club* ruling. As discussed above, the Second Circuit determined that the rights under the IAC, although self-executing, nonetheless could only be asserted through Section 44(b) of the Lanham Act. 203 F.3d at 128. The Court reached this conclusion because of the original text of Section 44(b), which specifically incorporated the treaty rights of

> [p]ersons who are nationals of, domiciled in, or have a bona fide and effective business or commercial establishment in any foreign country, which is a party to (1) the International Convention for the Protection of Industrial Property [the Paris Convention] . . . or (2) the General Inter–American Conventional for Trade Mark and Commercial Protection [the IAC] . . . or (3) any other convention or treaty relating to trade-marks, trade or commercial names, or the repression of

unfair competition to which the United States is a party . . . .

*Id.* (citing Trademark Act of 1946, ch. 540, § 44(b), 60 Stat. 427, 442). The Court ruled that even though the IAC was self-executing, because of this language, the plaintiff must assert its rights under the IAC pursuant to Section 44(b) of the Lanham Act. *Id.* Similarly, because the Paris Convention is included in the original language, even if it were self-executing, Cubatabaco would have to assert its rights under the Paris Convention pursuant to Section 44(b) of the Lanham Act.

 Cubatabaco has asserted its Article 6–bis claim pursuant to Section 44(h). As discussed above, Section 44(h) will only encompass Article 6–bis if Article 6–bis concerns "rights related to the repression of unfair competition." *Havana Club*, 203 F.3d at 135 n. 19. Article 6–bis, similar to Articles 7 and 8 of the IAC, permits the refusal or cancellation of registrations of marks that are similar to well-known marks registered in other member countries.[55] A different provision, Article 10–bis, explicitly addresses the provision of "effective protective against unfair competition." Article 10–bis.[56] There is no

---

**54.** Most recently, an unpublished decision of the Trademark Trial and Appeal Board also concluded that the Paris Convention is not self-executing. *Int'l Finance Corp. v. Bravo Co.*, Opp. Nos. 111, 276; 111, 760 (T.T.A.B. June 5, 2002) (collecting cases); *see also Scotch Whisky Assoc. v. United States Distilled Products Co.*, 1989 WL 274412, 13 U.S.P.Q.2d 1711, 1713 (Trademark Tr. & App. Bd.1989) (concluding that Paris Convention is not self-executing).

**55.** Article 6–bis states:

> 1) The countries of the Union undertake, ex officio if their legislation so permits, or at the request of an interested party, to refuse or to cancel the registration, and to prohibit the use, of a trademark which constitutes a reproduction, an imitation, or a translation, liable to create confusion, of a mark considered by the competent authority of the country of registration or use to be well

known in that country as being already the mark of a person entitled to the benefits of this Convention and used for identical or similar goods. These provisions shall also apply when the essential part of the mark constitutes a reproduction of any such well-known mark or an imitation liable to create confusion therewith.

> (2) A period of at least five years from the date of registration shall be allowed for requesting the cancellation of such a mark. The countries of the Union may provide for a period within which the prohibition of use must be requested.

> (3) No time limit shall be fixed for requesting the cancellation or the prohibition of the use of marks registered or used in bad faith.

**56.** Article 10–bis provides:

> (1) The countries of the Union are bound to assure to nationals of such countries effec-

such similar language in Article 6–bis. Therefore, for the reasons stated above, Cubatabaco cannot rely on Section 44(h) to encompass the substantive provisions of Article 6–bis and its claims based on this provision must be dismissed.[57]

### B. *State Common Law Claim*

Cubatabaco seeks summary judgment under the "New York common law" in the same section in which it discusses Article 6–bis of the Paris Convention. Cubatabaco fails to assert whether it refers to one or both of its New York common law claims and further fails to explicate the elements of either claim. The complaint contains two such claims: (1) misappropriation and (2) unfair competition. Complaint, ¶¶ 72–74 (unfair competition under state and common law); 78–81 (common law misappropriation).

The first claim, misappropriation, has been called "the essence of unfair competition," *Forschner Group, Inc. v. Arrow Trading Co.*, 124 F.3d 402, 408 (2d Cir. 1997). On the basis of this description, at least one district court has dismissed a common law misappropriation claim. *Something Old, Something New, Inc. v. QVC, Inc.*, 1999 WL 1125063, at *13 (S.D.N.Y. Dec. 8, 1999) (*citing Forschner* and dismissing misappropriation claim as it was considered part of unfair competition claim). Because the parties have not briefed the subject and because it is not

even clear whether the misappropriation claim is at issue, the claim will not be dismissed at this time. However, Cubatabaco has failed to establish it should as a matter of law succeed on this claim.

■ New York common law unfair competition requires a showing of (1) likelihood of confusion and (2) bad faith. *Saratoga Vichy Spring*, 625 F.2d at 1044; *see also Lane Capital Mgmt., Inc. v. Lane Capital Mgmt. Inc.*, 15 F.Supp.2d 389, 400 (S.D.N.Y.1998) (noting that record "does not establish with clarity that defendant acted in bad faith, an essential element of unfair competition"); *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 149 (2d Cir.1997) ("Under New York law, common law unfair competition claims closely resemble Lanham Act claims except insofar as the state law claim may require an additional element of bad faith or intent."). In discussing its New York common law claim, Cubatabaco does not address either prong, nor refer to any section of its brief that does. As discussed earlier, however, Cubatabaco did raise the issue of likelihood of confusion in another section, and a question of fact remains as to whether likelihood of confusion will result.

General Cigar challenges this claim because it is the registered user of the COHIBA mark in the United States. A Central District of California court faced an analogous situation in *Grupo Gigante S.A. v. Dallo & Co.*, 119 F.Supp.2d 1083, 1089

tive protection against unfair competition. (2) Any act of competition contrary to honest practices in industrial or commercial matters constitutes an act of unfair competition. (3) The following in particular shall be prohibited: 1. all acts of such a nature as to create confusion by any means whatever with the establishment, the goods, or the industrial or commercial activities, of a competitor; 2. false allegations in the course of trade of such a nature as to discredit the establishment, the goods, or the industrial or commercial activities, of a competitor; 3. indications or allegations

the use of which in the course of trade is liable to mislead the public as to the nature, the manufacturing process, the characteristics, the suitability for their purpose, or the quantity, of the goods.

57. Cubatabaco has asserted a claim under Article 10–bis as well, which presumably would not face the same difficulty. However, Cubatabaco has not moved for summary judgment on its Article 10–bis claim and its merits—as well as General Cigar's arguments regarding it—will not be addressed at this time.

(C.D.Cal.2000). The defendants, owners of a grocery store who had registered their mark with the state, claimed that the state registration made the common law well-known mark doctrine unavailable. The court rejected this argument, reasoning that a foreign mark must be protected if it was well-known in the United States prior to the party's obtaining rights to the mark through the state process. *Id.* at 1089–92 ("If a mark used only on products or services sold abroad is so famous that its reputation is known in the United States, then that mark should be legally recognized in the United States." (quoting McCarthy, *supra,* § 29:4, at 29–9)).

Although the *Grupo Gigante* case involved state rather than federal registration, the difference is not dispositive. After all, federal registration is only *prima facie* evidence of ownership, rather than a deed to the mark. Lanham Act, Section 33. Therefore, Cubatabaco might have prior rights to the COHIBA mark if it was well-known prior to General Cigar's first use of the mark in 1992.

▪ An issue of material fact exists as to whether the Cuban COHIBA was well-known by November 1992. The Cuban COHIBA was recognized in *Cigar Aficionado* to be "perhaps the world's finest smoke." It had been selling around the world for ten years, and had been mentioned in several different magazine articles in the United States. Moreover, within the particular niche market of the cigar industry, the Cuban COHIBA was renown.

General Cigar also recognized the renown of the Cuban COHIBA. Milstein testified that in 1989, 1991 and October 1992, General Cigar wanted to use a label as near as possible to the Cuban COHIBA "to somehow capitalize on the success of the Cuban brand, and especially [in October 1992] the good ratings that it got, the notoriety that it got from *Cigar Aficionado.*" Milstein Dep. at 284. Milstein wrote a memorandum echoing similar thoughts in January 1993, concerning General Cigar's strategy "to exploit the popularity, familiarity, brand recognition and overall success of the Cuban Cohiba." Further, in the spring of 1993, General Cigar's advertising agency developed a campaign, the first phase of which was to "[e]xploit the Cohiba name, with its reputation as one of the world's finest cigars amongst cigar smokers, to build a brand image for the U.S. Product."

Cubatabaco has thereby raised a material issue of fact as to whether the Cuban COHIBA was "so famous that its reputation [was] known in the United States" and thus "should be legally recognized in the United States." *Grupo Gigante,* 119 F.Supp.2d at 1089. Therefore, while summary judgment may not be granted on this count, nor can the unfair competition claim be dismissed.

## C. *Federal Trademark Dilution Act*

Cubatabaco moves for partial summary judgment on Count XII,[58] alleging infringement of the Federal Trademark Dilution Act of 1995 ("FTDA"), 15 U.S.C. § 1125(c)(1).

The FTDA provides that the "owner of a famous mark shall be entitled, subject to the principles of equity ..., to an injunction against another person's commercial

---

**58.** Cubatabaco has not moved on the parallel state law claim in Count XII, N.Y.Gen.Bus. Law. § 360–1. However, in a footnote, General Cigar alleges that Section 43(c)(3) of the Lanham Act bars this claim because of General Cigar's valid registration of the COHIBA mark. Def.'s Opp.Mem. at 28 n. 21. This subject will not be addressed as that claim is not at issue and, in any case, one of Cubatabaco's claims is that the 1995 registration should be cancelled. Until the issue is raised as to whether the 1995 registration is valid, General Cigar cannot rely on Section 43(c)(3) to dismiss the state law claim.

use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark." 15 U.S.C. § 1125(c)(1). "Dilution" for purposes of the FTDA is "the lessening of the capacity of a famous mark to identify and distinguish goods and services, regardless of the presence or absence of (1) competition between the owner of the famous mark and the other parties, or (2) likelihood of confusion, mistake, or deception." 15 U.S.C. § 1127.

The Second Circuit has summarized the five elements needed to establish unlawful dilution under the FTDA: "(1) the senior mark must be famous; (2) it must be distinctive; (3) the junior use must be a commercial use in commerce; (4) it must begin after the senior mark has become famous; and (5) it must cause dilution of the distinctive quality of the senior mark." *Nabisco Inc. v. PF Brands, Inc.,* 191 F.3d 208, 215 (2d Cir.1999).

### 1. *General Cigar's Registration is Not a Defense*

General Cigar's primary contention is that its ownership of the COHIBA mark in the United States provides a defense to this claim. However, "federal registration is no defense to a charge of dilution under the federal Anti-dilution Act." McCarthy, *supra,* at § 24:90, at 24–150. Such could not be the case, as dilution itself provides a ground for cancellation of a registration. 15 U.S.C. § 1052.

### 2. *There is a Material Issue of Fact as to Whether Cubatabaco Owns the COHIBA mark in the United States*

The. FTDA requires that the plaintiff be the "owner" of the mark. Gen-

eral Cigar argues that Cubatabaco is not the "owner" of the COHIBA mark in the United States because it did not register the mark with the PTO. This argument ignores that one need not have registered the mark to "own" it.[59]

As discussed above, under the "well-known marks" doctrine, a party with a well-known mark at the time another party starts to use the mark has priority over the party using the mark. In *Gigante,* discussed above, the defendants argued that the plaintiff, who had not registered the mark in California or through the U.S.P.T.O., could not make a dilution claim under the FTDA "because they do not own the mark." *Gigante,* at 1098 n. 10. There was no question that plaintiff had registered and owned the mark in Mexico. However, the court did not look to the plaintiff's ownership in Mexico, but instead rejected the defendants' argument because the Court had determined that the Gigante mark was a well-known mark prior to defendants' first use, and therefore the plaintiffs owned the U.S. rights to the mark. *Id.* at 1089.

As discussed above, there is an issue of material fact as to whether Cubatabaco was the Cuban COHIBA was a "well-known" mark in 1992 and thus "owns" the rights to the COHIBA mark in the United States. Therefore, summary judgment may not be granted on this ground.

### CONCLUSION

For the foregoing reasons, Cubatabaco's Count I (Article 6–bis of the Paris Convention) and III (Article 7 and 8 of the IAC) are dismissed. Cubatabaco's motions for summary judgment on its claim of abandonment (Count XI) and to dismiss General Cigar's equitable defenses are granted.

---

**59.** General Cigar's argument is further undercut by the language of the FTDA, which states that a court may, but not shall, look to whether the mark was registered in determining whether it was distinctive or famous. 15 U.S.C. § 1125(c)(1)(H). The drafters could easily have required registration by using the replacing "may" with "shall."

General Cigar's motion for summary judgment on the basis of its equitable defenses are denied. In light of the December 5, 2000, Order and the above opinion, Cubatabaco's cause of action is now limited to (1) Count II (Article 10–bis of the Paris Convention); (2) Count IV (Articles 20 and 21 of the IAC); (3) Count VII (Trademark Infringement Under Section 43(a) of the Lanham Act); (4) Count X (state and common law unfair competition); (5) Count XI (cancellation of the 1995 registration); (6) Count XII (dilution under state and federal law); and (7) XIII (common law misappropriation).

A pretrial conference will be held in September 2002 on a date convenient to counsel to schedule any further proceedings.

It is so ordered.